Eugene R. THRASH, Plaintiff-Appellee,

v.

A. J. O'DONNELL, Jr., District Director, Internal Revenue Service, Defendant-Appellant,

United States of America, Intervenor-Appellant.

No. 29743.

United States Court of Appeals, Fifth Circuit.

Aug. 16, 1971.

Charles S. White-Spunner, Jr., U. S. Atty., Mobile, Ala., Michael D. Cropper, Johnnie M. Walters, Asst. Atty., Gen., Lee A. Jackson, John A. Townsend, Meyer Rothwacks, William A. Friedlander, Attys., Dept. of Justice, Tax. Div., Washington, D. C., for appellant.

W. McLean Pitts, J. Garrison Thompson, Pitts, Pitts & Thompson, Selma, Ala., for appellee.

Before JOHN R. BROWN, Chief Judge, and WISDOM and RONEY, Circuit Judges.

JOHN R. BROWN, Chief Judge:

In this appeal, the Government finds itself in the awkward position of having to complain of evidence admitted into trial on its own suggestion. Finding as we do that any such error was harmless and that an apparent error in the charge turns out not to be so in fact, we affirm the judgment of the Court below in favor of Taxpayer.

### I. The Device and the Tax

Taxpayer Thrash operated an "Electric Box Score Game," a mechanical wagering device not unlike roulette in the nature of the gambling risk involved.[1] The

---

1. A more complete description of the "Electric Box Score Game" is provided by the Commissioner's Excise Tax Advisory Memorandum 1213, April 30, 1952 sent to the manufacturer's counsel:

"Electric Box Score Game. This is a mechanically simulated baseball game, not coin-operated, representing 16 teams in the two major leagues. The operation of this machine is entirely in the hands of the operator, although the mechanism, not he, determines the outcome of the game. About 20 minutes are required to complete the game, and at the end the team having the highest number of runs appearing on the electric board is the winner. Before and during the game, ticket cards similar to the ones described in Item 'A' but not having the tip number or seal number, are sold to the players for 5¢ 10¢, or 25¢, depending on the amount of the prize. Each sealed ticket on the card gives a number corresponding to the team number on the board. Each card contains only 16 tickets, so that there is only one winner per card. However, more than one card is usually sold during the running of a game, so several winners are present.

Each winner at the end of the game is awarded a prize of a cash award which was indicated at the top of the card from which his winning ticket was purchased. Some cards give the winner a chance to win a higher award than his guaranteed prize if, at the end of the game, he pushes out a lucky push at the top of the cardboard from which he purchased his winning ticket. If any tickets are not sold during a game, they are kept by the operator at his risk and the prize is awarded, regardless. At the end of the game, at

game had been purchased pursuant to a promotional letter sent to Taxpayer by the manufacturer of the device. The promotional letter referred to and quoted from a private ruling letter issued by the Commissioner of Internal Revenue to attorneys for the manufacturer, in which the Commissioner concluded that the device in question, if operated in the specified manner, would fall within a statutory exclusion from the definition of a taxable lottery.[2]

## II. Admission of the Revenue Ruling

 The only question before the Trial Court was whether or not Taxpayer operated the game in the manner necessary to qualify for the statutory exclusion. At the pretrial conference the Gov-

ernment had stipulated to the admissibility of the promotional letter and the pretrial order stated it "is received in evidence." But at trial, without seeking leave to amend or withdraw the stipulation, the Government objected to introduction of the letter, on grounds that it was irrelevant to the fact determinations then at hand.[3] When the Trial Court indicated that he was going to overrule the Government's objection and admit the promotional letter, the Government requested that "to minimize prejudicial error" the private ruling letter be admitted instead of the promotional letter. The Trial Court granted this request.

Although the record indicates strongly to us that the Government agreed to the introduction and use of the advisory memorandum,[4] it now asserts that intro-

---

which all players are normally present, the prize is usually paid out immediately in the presence of all the players."

2. The revelant portion of the Internal Revenue Code provides:

"*Lottery.*—The term 'lottery' includes the numbers game, policy, and similar types of wagering. The term does not include—

(A) any game of a type in which usually

 (i) the wagers are placed,

 (ii) the winners are determined, and

 (iii) the distribution of prizes or other property is made, in the presence of all persons placing wagers in such game * * *."

Internal Revenue Code of 1954, § 4421 (2).

The Advisory Memorandum quoted from the Senate Finance Committee Report accompanying H.R. 4473, Revenue Act of 1951 to give us this interesting if not enlightening information on why such combination of activities were not to be a "lottery":

"Thus, both bills exclude from the term 'lottery' any game of a type in which the wagers are usually placed, the winner or winners are usually determined, and the distribution of prizes or other property is usually made, in the presence of all persons placing wagers in the game. Among those games which are within the scope of the exclusion would be card games such as draw poker, stud poker, and blackjack, roulette games, dice games such as craps, bingo, and keno games and

the gambling wheels frequently encountered at country fairs and charity bazaars. On the other hand, punchboards would not normally be excluded under this definition."

3. The Government's explanation for its objection after previous stipulation takes this form. At the pretrial conference, Government counsel had agreed to the admission of the manufacturer's letter because it was relevant to the issue of whether taxpayer had reasonable cause for his failure to file excise tax returns. However, since that issue was conceded by the Government prior to trial, the letter was no longer relevant and a pretrial stipulation admitting this evidence does not bar the Government from objecting to its admission on the grounds of nonrelevance to the sole issue remaining.

Since our decision does not rest on the issue of the previous stipulation, we find it unnecessary to decide whether the pretrial order could have been disregarded, as the Government attempted to do, without a prior motion and amendment of the pretrial order. But see footnote 7, *infra.*

4. After pointing out that the promotional letter had significant omissions from the ruling it was publicizing Government counsel stated:

"We have no objection if [Taxpayer's counsel] wants to use the original ruling. It would be fine if he wants to use the original ruling.

THE COURT:

I will do that, or I will let you offer that to show the language that was given."

duction of the private ruling constituted reversible error. Arguing on authority of the well-established rule that a taxpayer may not rely on private rulings not addressed to him,[5] the Government urges that admission of the letter prejudicially allowed the jury to consider the Taxpayer's good faith, rather than deciding the case on the fact questions properly before them. Further, it is asserted, admission of the letter improperly influenced the jury that the Commissioner had taken a prior position on this issue inconsistent with the instant case.

We need not decide whether the Government preserved the point or whether the Government really complains of the admissibility of the wrong document since the private ruling letter was admitted instead of the promotional letter solely at the Government's suggestion. For we are of the view that it was all harmless if—and the if is a very big one—it was error at all.

Oddly enough the jury already knew of it since Section B of the ruling (see note 1, *supra*) was set out verbatim in Taxpayer's amended complaint. More important, all it did was to describe the operations which had to take place to come within the exemptions. And as the Court told[6] and retold the jury four or five times, that was what they had to decide, step by step.

Although we disclaim resting this decision on the untimely, unannounced, presumptuous indifference to the pretrial stipulation and order that the promotional letter "is admitted," we are entitled to weigh excusability in the light of the situation suddenly and improperly pressed on the Judge.[7]

Thus we conclude that any error in the admission of the revenue ruling was harmless, particularly in view of the fact that the situation was thrust upon the Judge suddenly and unexpectedly by the Government's improper disregard of the pretrial order.

III. Burden of Proof and Rule 49(a)

The second issue raised by the Government is that the Trial Court's charge to the jury improperly placed the burden of proof on the Government on its counterclaim.

Taxpayer had paid a small part of the Commissioner's assessment and brought suit against the District Director for refund. The United States intervened and cross-claimed for the remainder of the deficiency. In charging the jury, the Trial Court properly instructed that Tax-

---

5. See, e. g., Hanover Bank v. Commissioner of Internal Revenue, 1962, 369 U.S. 672, 686, 82 S.Ct. 1080, 8 L.Ed.2d 187. Goodstein v. Commissioner of Internal Revenue, 1 Cir., 1959, 267 F.2d 127, 132; Minchin v. Commissioner of Internal Revenue, 2 Cir., 1964, 335 F.2d 30, 32–33; Weller v. Commissioner of Internal Revenue, 3 Cir., 1959, 270 F.2d 294, 298–299.

6. For example, in passing upon Government objections to the questions put to a witness regarding statements in a deposition concerning IRS regulations and compliance with them, the Judge observed:

"THE COURT:
Let me caution the jury about one thing, that really the trouble with that is that that brings on the answer that they had been told that the manner in which they were operating it was all right, and, of course, that is what you have got to determine, but the really proper way is, whichever the rule was written, or whichever way this was written, is to have that communicated to you and let you decide with reference to whether it was operated within the rule, and the law as I give it to you."

7. Stipulations and pretrial orders are binding on parties including the Government until modified. See United States v. 237,500 Acres of Land, More or Less, in Counties of Inyo and Kern, State of Calif. (D.C.Cal.1964), 236 F.Supp. 44, aff'd., 9 Cir., 404 F.2d 336; Burstein v. United States, 8 Cir., 1956, 232 F.2d 19; Morse Boulger Destructor Co. v. Camden Fibre Mills, Inc., 3 Cir., 1957, 239 F.2d 382; Hoffman v. Celebrezze, 8 Cir., 1969, 405 F.2d 833. Parties are not to be subjected to signal changes in the middle of the play. Laird v. Air Carrier Engine Service, 5 Cir., 1959, 263 F.2d 948. Nor are judges.

payer had the burden of proving each element of his case with a preponderance of the evidence and unless the jury found that he had, Taxpayer should not be allowed to recover. On the Government's cross-action the Trial Court ostensibly, but not actually, placed the burden improperly on the Government.[8]

We say ostensibly because, first, there is much doubt that what was said was anything more than a juridical slip of the tongue,[9] and second, in the charge as a whole the Court stated time and again what the jury had specifically to determine and what the effect was on Taxpayer and Government.

Actually, what the Judge did was to use the marvelous device of a general charge with special interrogatories under F.R.Civ.P. 49(a).[10] Ironically, as in the case of the revenue ruling, it was the Government which by formal requested charges—all of which were given—sought submission by specific questions covering each of the three conjunctive elements of the exemption.[11]

8. Clearly, even if the Commissioner's determination of tax liability is presented by way of cross-appeal in a refund suit, the burden is on the taxpayer to prove with a preponderance of the evidence, that the Commissioner's determination is erroneous. See Bar L Ranch Inc. v. Phinney, 5 Cir., 1970, 426 F.2d 995; Lesser v. United States, 2 Cir., en banc, 1966, 368 F.2d 306; United States v. Molitor, 9 Cir., 1964, 337 F.2d 917.

9. Early in the charge the Judge stated: "[Taxpayer], in seeking to recover what he paid in as taxes, the burden is on him to prove every essential element of his claim by a preponderance of the evidence.

If the proof should fail to establish any essential element of [Taxpayer's] claim by a preponderance of the evidence in the case, the jury should find for the Defendant, [District Director of I.R.S.].

Now, in the United States claim against [Taxpayer], they have the preponderance of the evidence, but I might say this:

If you find for [Taxpayer] in his case, you can't find for the government in this case.

If you find for the government in its claim against [Taxpayer], you can't find for [Taxpayer] in his claim against the director of revenue, because it would be inconsistent, because it would be turning on the fact of whether or not the operations of this came down there during this period of time concerned here meets the exemption from the taxing statute, and that is what you have got to decide."

10. See J. Brown, Federal Special Verdicts: The Doubt Eliminator, 1968, 44 F.R.D. 338; 2B Barron, Holtzoff & Wright, Federal Practice and Procedure, ch. 10, §§ 1051–60. This Court has often extolled the flexibility and utility provided by Rule 49(a), See, e. g., Martinez v. Rodriquez, 5 Cir., 1968, 394 F.2d 156, 157 n. 1; Weymouth v. Colorado Interstate Gas Co., 5 Cir., 1966, 367 F.2d 84; American Oil Co. v. Hart, 5 Cir. 1966, 356 F.2d 657; Vandercook & Son, Inc. v. Thorpe, 5 Cir., 1965, 344 F.2d 930; E. L. Cheeney Co. v. Gates, 5 Cir., 1965, 346 F.2d 197; Page v. St. Louis Southwestern Ry. Co., 5 Cir. 1965, 349 F.2d 820; Nesmith v. Alford, 5 Cir., 1963, 318 F.2d 110, cert. denied, 1964, 375 U.S. 975, 84 S.Ct. 489, 11 L.Ed.2d 420.

11. The questions submitted were stated orally by the Judge and also given to the jury on a separate sheet as follows (the jury's answers are inserted):

1. Did the persons betting on the electric box score game usually place their bets in the presence of each other? Indicate your answer by checking the appropriate line below.

X Yes _____ No

If your answer to Question No. 1 is "No", then you need not proceed to Question No. 2. If, however, your answer to Question No. 1 is "Yes", then you must proceed to Question No. 2.

2. Were the winners of the electric box score games usually determined in the presence of all persons who had placed bets on the games? Indicate your answer by checking the appropriate line below.

X Yes _____ No

If your answer to Question No. 2 is "No", then you need not proceed to Question No. 3. If, however, your answer to Question No. 2 is "Yes", then you must proceed to Question No. 3.

3. Were the cash prizes usually distributed to the winners of the electric box score games in the presence of all persons who had placed bets on the games? Indicate your answer by checking the appropriate line below.

X Yes _____ No

Not only were the decisive fact issues pinpointed, but the Court, giving full use to the flexibility of the Rule 49(a) device, gave specific instructions on the answers open to the jury, their effect as "Yes" or "No" as well as controlling principles.[12] In all of these, his earlier positive instructions on Taxpayer's burden of proof were in effect repeated and repeated.[13] The only way Taxpayer could win was by convincing the jury by a preponderance of the evidence to answer all questions "Yes." And with the interrogatories constructed as they were (see note 11, *supra*), calling for dependent answers, the Government never had any burden either of proof or persuasion for contingent dependent answers. The failure to find "Yes" automatically called for a "NO" and on that the Government automatically prevailed. At no time did the Court ever speak in terms of the Government having the burden to convince the jury to a "No" answer to the questions. All was tied to Taxpayer affirmatively establishing all "Yes" answers.

The only complication is that the Judge gave the jury two forms of a general verdict, one for Taxpayer, one for the Government. These were wholly unnecessary and in any event the instructions were clear that the form of the general verdict depended on the answers to the interrogatories. Having found all "Yes" and having been properly instructed as to the requirements to reach such successive answers, the form of general verdict followed automatically. That in one ref-

---

12. These, as were his earlier instructions (see note 9, *supra*) were couched always in the sharp disjunctive: All "Yes" answers meant the Taxpayer won—a single "No," the Government prevailed.

For example, the Judge after listing the three elements said:

"What you have got to determine is whether or not he comes within the exemption. If he falls within the exemption, then he would be entitled to the recovery of his tax and interest. If he does not fall within the exemption, then he would not be entitled to his tax and a recovery, and if he did not fall within the exemption, then the government would be entitled to recover.

Now, the definition of law that has to do with exemptions says, in effect, that this would not be covered, provided all three of these things are present.

\* \* \* \* \*

Did the person betting on the electric box score games usually place their bets in the presence of each other?

Were the winners of the electric box score games usually determined in the presence of all persons who placed their bets on the games?

And, three, were the cash prizes usually distributed to the winners of the electric box score game in the presence of all persons who placed bets on the games?

All three of those things must be present. If only two of them are present, then they are not excluded. If only one of them is present, then it is not excluded, but if all three of them were present, then they would be excluded."

13. For example:

"In other words, the Plaintiff, to be entitled to recover in this [action], he must have *demonstrated* to you, in the day to day operations of the electric box score game, that it was normal and customary for all of the betters to be present while the bets were placed, and the winners were determined and prizes were distributed, and if the evidence *failed to satisfy* you that the game was usually operated in this fashion, then I instruct you that the Plaintiff *has failed* to prove his case." (Emphasis supplied)

After reading the interrogatories (see note 11, *supra*) he stated:

"You determine these questions, and when you have determined them you will have your verdict.

If you answer no to any of the questions, to any of the three, then your verdict would have to be for the defendant, the director of the internal revenue, and for the United States Government, and the Government would recover.

If your answer is yes to all three questions, then your verdict would have to be for the Plaintiff.

If you answer to any one of the three no, then your verdict would have to be for the government, and it would have to be for the [District Director].

If your answer is yes to all three of them, then your verdict would have to be for the [Taxpayer], and it would have to be for him on the lawsuit of the government against him."

erence to the form for rendering a verdict for the Government the Court spoke in terms of the Government's burden of proof cannot be turned into harmful error where the jury answered the questions precisely and then filled out the general verdict forms consistent with those answers and the Judge's binding instructions.

Thus, what might have been an impossible problem of deciphering the actions of the jury from the enigma-wrapped-in-a-mystery of a single general verdict plus the law's strange fiction that the jury heeds the Judge only when he commits a verbal error, became a simple matter of applying plain statutory language to facts specifically found on evidence that no one can challenge. That speaks well again for 49(a).

The upshot is that the Government's contentions are both without merit. Unlike Taxpayer's patrons who committed their economic fate to the whims of chance, we hold that Taxpayer did not risk imposition of the lottery tax by operating his Wheel of Fortune—or at least, the jury so found. That finding having been fairly, properly and conclusively ascertained, the case ends right there.

Affirmed.

Browning, Circuit Judge, dissented and filed opinion.