GAINESVILLE UTILITIES DEPARTMENT and City of Gainesville, Florida, Plaintiffs-Appellants,

v.

FLORIDA POWER AND LIGHT COMPANY, Defendant-Appellee.

No. 76–1542.

United States Court of Appeals, Fifth Circuit.

May 22, 1978.

As Modified on Denial of Rehearing and Rehearing En Banc July 28, 1978.

John P. McKenna, John C. Scott, Washington, D. C., Osee R. Fagan, Gainesville, Fla., for plaintiffs-appellants.

John E. Mathews, Jr., H. P. Osborne, Jr., Jack W. Shaw, Jr., Jacksonville, Fla., J. T. Blount, Miami, Fla., for defendant-appellee.

Before BROWN, Chief Judge, GODBOLD, Circuit Judge, and MEHRTENS[*], District Judge.

JOHN R. BROWN, Chief Judge:

After ten years of litigation and one trip to the Supreme Court in a related case[1], we finally reach the merits in this private antitrust suit. The City of Gainesville[2] contends that by resisting an interconnection with its municipal power system Florida Power & Light (P&L) violated both Sherman Act § 1 and § 2. 15 U.S.C.A. §§ 1–2. A jury found for the defendant on special verdicts, and the District Court denied a judgment n. o. v. After an extensive review of the record, we reverse on one ques-

---

1. *Gainesville Utilities Dept. v. Florida Power Corp.*, 1971, 402 U.S. 515, 91 S.Ct. 1592, 29 L.Ed.2d 74.

2. For convenience, we refer to both plaintiffs-appellants in this case as "the City" or "Gainesville."

tion only [3]. We hold that the evidence compels a finding that P&L was part of a conspiracy [4] with Florida Power Corporation (Florida Power) to divide the wholesale power market in Florida.

### Connecting On An Interconnection

The municipal utility system of Gainesville serves customers within the City and in the surrounding area in Alachua County, located in the north central part of Florida. Privately owned P&L, the largest electric utility in the state, operates generally in the eastern and southern parts of Florida from Jacksonville in the north to the Miami area in the south. P&L serves two cities on the eastern edge of Alachau County. The closest P&L line to the Gainesville system is within approximately 18 miles. Florida Power, also privately owned, serves the area on the western side of Gainesville. As the second largest electric utility in the state, its predominant service area is the western and central portions of Florida from the Panhandle in the north to the St. Petersburg area in the south. Florida Power's lines are within the City of Gainesville. The company serves, for example, the University of Florida, located inside the city limits.

This case grew out of Gainesville's long struggle to obtain an interconnection for its electric system with either of these two power companies. The Supreme Court has described the merits of an interconnection, as follows:

> The major importance of an interconnection is that it reduces the need for the "isolated" utility to build and maintain "reserve" generating capacity. An interconnection is simply a transmission line connecting two utilities. Electric power may move freely through the line up to the line's capacity. Ordinarily, however, the energy generated by each system is sufficient to supply the requirements of the system's customers and no substantial amount of power flows through the interconnection. It is only at the times when one of the connected utilities is unable for some reason to produce sufficient power to meet its customers' needs that the deficiency may be supplied by power that automatically flows through the interconnection from the other utility. To the extent that the utility may rely upon the interconnection to supply this deficiency, the utility is freed of the necessity of constructing and maintaining its own equipment for the purpose.

*Gainesville Utilities Dept. v. Florida Power Corp.*, 1971, 402 U.S. 515, 518–20, 91 S.Ct. 1592, 1595, 29 L.Ed.2d 74, 78–79 (footnote omitted). Thus, to avoid making a large investment in generating equipment, Gainesville needed an interconnection.

During World War II, the Federal Power Commission (FPC) issued an emergency order requiring a low capacity interconnection between Florida Power and the City. When the emergency ended and the order was terminated, Florida Power tried to persuade the City to purchase power at wholesale from the company instead of installing additional generating capacity. The City

---

3. We commend the District Court for using special verdicts in this complex antitrust case. F.R.Civ.P. 49(a). They allow us to zero in on exactly where we think the trial court erred without disturbing acceptable factual findings. Brown, *Federal Special Verdicts: The Doubt Eliminator*, 44 F.R.D. 338 (D.C., 1967). *See Wolfe v. Virusky*, 5 Cir., 1972, 470 F.2d 831, 837 (Brown, C. J., concurring); *In re Double D Dredging Co.*, 5 Cir., 1972, 467 F.2d 468, 469 n. 3; *Thrash v. O'Donnell*, 5 Cir., 1971, 448 F.2d 886, 889–92. Indeed, they enable us to put an end to the § 1 allegation that P&L refused to interconnect unless there was a retail territorial agreement, as well as to the § 2 attempt to monopolize claim, although the § 1 issue on dividing the wholesale market goes back for

retrial. The charge was a model of perfection in its careful instructions on guiding legal principles and in meticulously tying them to the specific numbered questions. All fourteen special verdict questions are attached as an appendix.

4. Section 1 of the Sherman Act makes every "conspiracy, in restraint of trade or commerce" illegal. 15 U.S.C.A. § 1. As defined by the trial court in its jury charge and as used in this opinion, the word "conspiracy" for § 1 purposes means any agreement, understanding, reciprocal practice, or concert of action between the parties.

refused, and Florida Power dismantled the interconnection when new generation for the City's system was installed in 1955.

As Gainesville's utility system grew, however, so did interest in an interconnection. In 1964, James Richardson, an outspoken advocate of interconnection, was elected to the City Commission. He and other members of the Commission explored the possibility of interconnection, primarily with Florida Power. The City and Florida Power were at that time competing for customers southwest of Gainesville, and Florida Power insisted, as a prerequisite to interconnection, upon a territorial division for retail customers that would restrict the municipal system to the city limits.[5]

Finally, in January 1965, John Kelly, the director of Gainesville's utility system, wrote the chairman of the FPC requesting assistance in obtaining an interconnection from either Florida Power or P&L. The FPC sent copies of the letter to both companies and asked for comments.

The day after P&L received the Commission's letter, Robert Fite, president of the company, also received a letter from Ed Dunn, vice-president and general counsel of Florida Power, attaching copies of Kelly's letter and that of the FPC. Dunn asked Fite to "furnish me on or before Friday, February 12, 1965, your comments in this matter so that we might prepare our response to the Federal Power Commission." Px 5. Fite routed Dunn's letter to Ben Fuqua, vice-president of P&L, with an "F.Y.I." notation, and a copy also was sent to McGregor Smith, P&L's chief executive officer.

A week later, Florida Power's president, William Clapp, wrote the FPC indicating a willingness to discuss interconnection with the City on the same terms previously demanded by the company. He further stated with specific reference to Kelly's request

about obtaining an interconnection with P&L:

> Florida Power Corporation and Florida Power & Light Company several years ago entered into territorial agreements to preserve territorial integrity, thus avoiding duplication and economic waste. These agreements are on file with the Florida Public Utilities Commission, pursuant to that Commission's jurisdiction of these two companies. *Accordingly, we would have to resist any effort to violate the letter or spirit of these territorial agreements.*

Px 294 (emphasis added). Clapp then sent Fite a copy of the letter "to keep you informed on this matter, in case you have any questions put to you." Px 6.

On February 17, 1965, the final day for submitting comments, Fuqua wrote on behalf of P&L:

> The facilities of the Florida Power Corporation are, of course, much closer to those of the City of Gainesville than are any facilities of our Company. Obviously, we feel it would be an economic waste for us to undertake to build lines when Florida Power Corporation is already in immediate proximity.
>
> We have received a copy of the letter addressed to the Commission by Mr. W. J. Clapp, President of the Florida Power Corporation, and we have observed that Mr. Clapp expresses a willingness to sit down and try to work out this situation with the City of Gainesville officials. We are quite hopeful that this can be done.

Px 7.

Representatives of the City and Florida Power subsequently met several times to discuss the interconnection, but the discussions ended in failure. In November 1965, the City filed a formal application with the FPC for an order directing Florida Power to interconnect. No application was filed

5. The legality of territorial agreements at the retail level is not before this Court. However, retail territorial agreements, approved by the Florida Public Service Commission, have been upheld under Florida's antimonopoly statute.

against P&L because at the time it was not subject to Commission jurisdiction.[6]

During the FPC proceeding which eventually culminated in an interconnection order, Clapp contradicted statements in his letter to the FPC and asserted that Florida Power had no "agreement" with P&L prohibiting the latter from interconnecting with Gainesville. Kelly, after consulting with Commissioner Richardson who was then Mayor, wrote P&L on July 7, 1966, and inquired whether, in view of Clapp's testimony, P&L would open negotiations on an interconnection with Gainesville. Fite responded that the City should deal with Florida Power because such a tie, in his opinion, would be cheaper and more economical. "It is for this reason that we believe any tie with Gainesville would necessarily be one with Florida Power." Px 12.

Kelly wrote again on August 2. He questioned Fite's estimate of the cost of an intertie with P&L and asked "for a meeting between the engineers of Florida Power & Light and Gainesville to determine the engineering necessary for the interconnection and its cost." Px 13.

Fite responded by making it clear to Kelly that the City should resign itself to dealing with Florida Power since even P&L wanted the City to agree with Florida Power on a retail territorial arrangement:

> In discussing a possible interconnection with Gainesville among ourselves, the question of responsibility for service areas always arises. *In this case, three parties are involved—the City of Gainesville, Florida Power Corporation, and Florida Power & Light Company.* It would seem that in order to avoid duplication of distribution facilities, *any plan should include an agreement that would define the service areas of all three suppliers and would clearly indicate the responsibility of each one.* Have you given any thought to this subject—and what are your comments as to how this matter could be resolved?

Px 14 (emphasis added). Kelly answered on August 30 that the City was prepared to discuss the possibility of a territorial agreement between the City and P&L even though "there is no necessary connection between interchange and territorial arrangements." He explained, however, that "[t]he question of a service area agreement between Gainesville and Florida Power is really an extraneous matter. . . . ." Px 304. When Fite did not respond, Kelly wrote again on October 10, noting that regardless of the outcome of the pending FPC proceeding against Florida Power, "we feel that we should keep the 'door' open for an intertie with your system as possibly being the more advantageous of the two courses open to us." Px 16.

On October 24, Fite responded. Despite Kelly's rejection of a territorial arrangement with Florida Power, Fite again asked Kelly to "consider and comment on 'service area responsibilities' of the several utility companies in the area," specifying it as "a preliminary to any person-to-person discussion." Px 18. This ended the correspondence.

Eventually, in August 1968, the City filed a complaint charging the two companies with violating § 1 and § 2 of the Sherman Act. While the case was pending, the FPC ordered Florida Power to interconnect with the City which was upheld by the Supreme Court in 1971.[7] The interconnection was completed in July 1973. Meanwhile, the antitrust suit against Florida Power was settled, but P&L remained a defendant.

---

*City Gas Co. v. Peoples Gas System, Inc.,* Fla., 1965, 182 So.2d 429.

**6.** FPC jurisdiction over P&L was not established until the Supreme Court's decision in *FPC v. Florida Power & Light,* 1972, 404 U.S. 453, 92 S.Ct. 637, 30 L.Ed.2d 600.

**7.** *Gainesville Utilities Dept. v. Florida Power Corp.,* 1971, 402 U.S. 515, 91 S.Ct. 1592, 29 L.Ed.2d 74.

The FPC hearing examiner had recommended an interconnection conditioned on reaching a retail territorial agreement with Florida Power. This requirement, however, was eliminated by the Commission. *Id.,* 1968, 40 F.P.C. 1226, 1240–42.

Gainesville sought damages of approximately 8 to 11 million dollars before trebling based on what the City believed it lost due to the delay in interconnection.

### Same Old Story

At trial, Gainesville primarily argued that P&L refused to interconnect because it was part of a conspiracy with Florida Power to divide the wholesale electric power market in Florida. In other words, P&L simply did not want to invade the territory of its competitor. To buttress this argument, Gainesville relied on internal memoranda and correspondence between the top echelons of P&L and Florida Power on how these two companies handled the requests for service from other cities.

For example, Florida Power served the town of Chiefland under a retail franchise. When the franchise expired in 1958, the City Council wrote P&L inquiring whether it would be interested in obtaining the franchise. In an internal memorandum, Ben Fuqua, vice-president of P&L at the time, stated why the company would not serve Chiefland:

> In the first place, *this is in the Florida Power Corporation territory* and they have been servicing Chiefland under a franchise which has expired. In the second place, it would probably require extensions of 60 or 70 miles for us to get to this locality.

Px 48 (emphasis added). Fuqua explained what else should be said in the letter:

> At the same time I would like to give a plug for the Florida Power Corporation people along the lines of their being a sister utility, a private enterprise corporation, etc., etc.
>
> You may recall that Bill Clapp [president of Florida Power], either by letter or by sending representatives, declined to consider wholesale supply of electricity to Lake City, Arcadia and Starke. In each of these instances he endorsed our company.

*Id.* Subsequently, Fuqua wrote Chiefland disclaiming interest in the franchise and sent a blind carbon to Clapp, Florida Power's president. Clapp, in turn, sent Fuqua his thanks and promised:

> Please be assured that if a similar situation should occur concerning your Company, we would be glad to reciprocate.

Px 51.

Arcadia, which was mentioned in Fuqua's memorandum, was served by a P&L franchise. In 1956, the City was considering buying the distribution system and asked Florida Power whether it would sell electricity to the City at wholesale. Florida Power's president Clapp wrote P&L's Fite about the request:

> I am asking Mr. A. V. Benson, our Division Manager in Lake Wales, to go by and talk to the author of the attached letter. By answering this letter verbally, I figure we might be of some assistance in pointing out to the City Attorney the error of their ways. You may be assured our answer is that we have no power facilities within this area.

Px 40 at 2. Fite thanked Clapp and expressed hope of helping him in return:

> We sure do appreciate what you are doing for us on the matter covered in your February 7 letter. I hope this and the same kind of matter in the northern end of the state will not continue to take your time.
>
> Again, thanks a million for your help. *I sure hope we have an opportunity to repay you.*

Px 42 (emphasis added).

Lake City, the second city mentioned in Fuqua's memorandum about Chiefland, had a similar problem as Arcadia. In 1955, P&L's retail franchise was expiring and the City asked Florida Power for service at either retail or wholesale. Clapp wrote back and declined while sending a blind carbon copy to Fite. Attached to the carbon copy was a handwritten note from Clapp to Fite explaining that "[t]his is about like I read to you over the phone." Px 37.

Finally, the third city named in Fuqua's memo, Starke, is a self-generating system located about 20 miles northeast of Gaines-

ville in an area served generally by P&L. In December 1954, Florida Power was approached about obtaining electric service. An internal office memorandum from E. E. Dearmin to Clapp explained what happened:

> As you suggested, I informed these gentlemen at the beginning that we were very sorry, but in no position whatsoever to make them a proposition as to supplying them with wholesale power service. I went into considerable detail as to why we could not make them a proposition, *stressing particularly the point of service area.*

Px 36 at 2 (emphasis added). Although P&L was not even serving Starke, Clapp, nonetheless, sent Fite a copy of the memo. Fite conceded at trial that the entire episode was "routine." R., vol. 19, at 102–03.[8]

The "routine" was followed when the City Clerk of Lake Helen wrote P&L in November 1956 soliciting an offer to purchase the municipally-owned electric system. Px 46 at 4. Alan Wright of P&L, who received the letter, immediately passed it up to Fuqua. Subsequently, Wright wrote the City declining to make a proposal, explaining that "we are not rendering service in the Lake Helen area and do not have facilities to serve there. . . ." *Id.* at 2. And even though Lake Helen was not being served by Florida Power, Wright sent a blind carbon of the refusal to Clapp. In June 1958, P&L's Fite reminded Clapp of the incident:

> When we discussed the territorial question in Boston the other day, you mentioned that you were interested in buying the electric facilities in Lake Helen. Perhaps you have forgotten but back in 1956 we received an inquiry from Lake Helen and wrote them that they were not in our territory and we had no proposal to make. Alan B. Wright signed the letter and sent you a blind copy. I am enclosing reproductions of these letters for your information.

8. At the time of the incident, P&L was interested in leasing the Starke system and had itself declined to sell power to Starke. Px 343. *Cf.*

Here's hoping you get Lake Helen. Px 46 at 1. At trial, Fite characterized the conduct as

> a routine kind of thing in the industry. It was a common courtesy to send a copy of matters that pertained to the other's company. These—these situations were just routine, that's all.

R., vol. 19, at 118.

In 1962, the City of Orlando's municipal utility system, which was interconnected with Florida Power, built a new generation facility near a P&L plant. P&L later interconnected with the Orlando plant, but Florida Power's assent to the interconnection was shown by a memorandum of August 8, 1962, from H. K. McKean, vice-president of Florida Power, to Clapp reporting on a meeting that day with McGregor Smith, P&L's chief executive officer. The meeting resulted in an agreement on a cross-state transmission line to be built from P&L's Brevard Station to Florida Power's West Lake Wales Station. One of the terms was that

> [t]he Florida Power Corporation will assist in obtaining an interconnection between the Brevard Substation of Florida Power & Light Company and the Indian River Plant of the Orlando Utilities Commission. *Mr. Smith admitted frankly that if it hadn't been for me, this interconnection would have been in some time ago.*

Px 121 at 1 (emphasis added).

In 1963, furthermore, the City of Winter Garden was served at retail by Florida Power, but it was considering switching to a municipally-owned system. P&L's Fite responded to an inquiry from a "citizens" committee with the statement that, while the company had received no request to sell power to Winter Garden, it would not do so in any event because the company did not supply municipal systems with wholesale power and because Winter Garden was beyond its "economic service area." He sent Clapp a blind carbon copy of his refusal.

Lake Helen, discussed *infra*, where P&L declined to deal with a municipal system that Florida Power was trying to acquire.

Finally, in a 1965 P&L internal memorandum, Fuqua reported to Fite on a telephone call from Angel Perez, vice-president of Florida Power. Fuqua was told that the City of Jacksonville, which had a municipal power system, had approached Perez directly about an interconnection. Perez had responded by asking why the City did not go to P&L with whom it already was intertied. When Jacksonville's representative said the City preferred a tie with Florida Power for economic advantages, "Perez inquired if P&L would let Florida Power Corp. go through its territory to serve Jacksonville." Px 58. Fuqua concluded the memo by explaining that "Perez will be over here to go to West Palm Beach with us next Thursday and we agreed we would discuss the matter further then. . . ." *Id.* At trial, Fuqua admitted that Perez had indeed come to P&L, but he could not recall talking to him about the matter. Fuqua did confirm, however, that Jacksonville never intertied with Florida Power. R., vol. 15, at 82.

After a lengthy trial, the case was submitted to the jury on fourteen special verdict questions concerning three theories of liability under Sherman Act § 1 and § 2. See Appendix. The first question pertained to an alleged § 1 violation:

1. Do you find by a preponderance of the evidence that there was an agreement, understanding or concert of action between Power & Light and Florida Power whereby Power & Light would not deal with Gainesville through an inter-

connection because Gainesville was in Florida Power's service territory?

The jury's negative answer precluded consideration of questions on whether the territorial agreement was a substantial factor in Gainesville's not having obtained an interconnection and on what damages, if any, Gainesville incurred. Since we find that "the facts and inferences point so strongly and overwhelming in favor" of Gainesville on the existence of a conspiracy to divide the market, *Boeing Co. v. Shipman,* 5 Cir., 1969, 411 F.2d 365, 374 (en banc), we reverse the trial court's refusal to grant Gainesville's motion for a judgment n. o. v. on this one question and remand for further consideration.[9]

### Dividing A Market

■ A horizontal market division in most industries is clearly a per se violation of the Sherman Act. *United States v. Topco Associates,* 1972, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515; *Hobart Brothers Co. v. Malcolm T. Gilliand, Inc.,* 5 Cir., 1973, 471 F.2d 894, *cert. denied,* 412 U.S. 923, 93 S.Ct. 2736, 37 L.Ed.2d 150. On the other hand, the heavily regulated electric power industry is often characterized by government sanctioned territorial agreements. In this case, however, the Florida Public Service Commission did not approve any territorial arrangement between P&L and Florida Power relating to the Gainesville area. Thus, we need not consider whether antitrust immunity exists because of state action.[10]

9. The second theory of liability also was based on Sherman Act § 1. The jury gave a negative reply to the question:

> 3. Do you find by a preponderance of the evidence that there was an agreement, understanding or concert of action between Power & Light and Florida Power whereby neither would interconnect with Gainesville unless the City would enter into a territorial agreement?

The jury's negative response again precluded consideration of whether the alleged agreement was a substantial factor in Gainesville's not having obtained an interconnection and of what damages, if any, Gainesville suffered.

The third theory of liability was that P&L attempted to monopolize the electric power market in violation of Sherman Act § 2. Gainesville claimed that the specific act which

furthered P&L's attempted monopolization was its refusal to deal with Gainesville or to interconnect without a territorial agreement. To establish whether such a refusal took place, the jury was first asked:

> 8. Do you find by a preponderance of the evidence that Gainesville sought an interconnection from Power & Light?

The jury's negative answer prevented consideration of questions on whether P&L refused to interconnect without a territorial agreement, if P&L was attempting to monopolize a relevant market, and what damages resulted.

10. In fact, the jury was specifically instructed that the Florida Public Service Commission did not approve any agreement on Gainesville between P&L and Florida Power. R., vol. 26, at 247. On the applicability of the state action

Moreover, *Otter Tail Power Co. v. United States,* 1973, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359, made it clear that even regulation by the FPC does not exempt an electric utility from prosecution under the antitrust laws. In *Otter Tail,* the Government challenged the defendant's refusal to sell wholesale power to municipalities or even to allow use of its transmission lines to transfer power. The Supreme Court in affirming the lower court's holding for the Government saw no reason to assume an antitrust exemption, nor to defer its decision pending FPC guidance.

■ The Supreme Court in *Otter Tail,* furthermore, specifically affirmed the part of the District Court's injunction preventing the defendant from entering into or enforcing any contract limiting the areas in which other power companies might sell electric service. *Id.,* 410 U.S. at 378–79, 93 S.Ct. at 1030, 35 L.Ed.2d at 368–69. Two Circuit Courts also have held that contracts between utility companies providing for territorial divisions are per se Sherman Act violations. *Montana-Dakota Utilities Co. v. Williams Electric Cooperative,* 8 Cir., 1959, 263 F.2d 431; *Pennsylvania Water & Power Co.,* 4 Cir., 1950, 184 F.2d 552, *cert. denied,* 340 U.S. 906, 71 S.Ct. 282, 95 L.Ed. 655. We apply, therefore, the same per se standard in this case to insure that the market is free of territorial restraints.[11]

*Conspiracy Or Only Conscious Parallelism?*

■ The crucial issue in this case is whether a conspiracy to divide the market actually exists.[12] No document expressly sets forth a territorial agreement between

Florida Power and P&L. However, proof of a conspiracy under § 1 of the Sherman Act does not require the existence of an express agreement. *United States v. Paramount Picture, Inc.,* 1948, 334 U.S. 131, 142, 68 S.Ct. 915, 921, 92 L.Ed.2d 1260, 1285. It is "enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it." *Interstate Circuit v. United States,* 1939, 306 U.S. 208, 226, 59 S.Ct. 467, 474, 83 L.Ed. 610, 620.

P&L argues that Gainesville proved only the existence of consciously parallel business activity, citing numerous cases for the proposition that standing alone such activity does not compel a directed verdict on the charge of conspiracy. As Justice Clark said in his frequently quoted statement, " 'conscious parallelism' has not read conspiracy out of the Sherman Act entirely." *Theatre Enterprises v. Paramount Film Distributing Corp.,* 1954, 346 U.S. 537, 541, 74 S.Ct. 257, 260, 98 L.Ed. 273, 279. P&L claims it acted solely on the basis of independent business evaluations in refusing service to cities. For example, P&L explains that it refused to consider Chiefland because sixty to seventy miles of high voltage transmission lines would have to be built to serve the city whose population at the time was only about 1,000. Likewise, P&L turned down Lake Helen's request because the company would have to build six miles of line to serve the city, and Winter Haven would have required thirty miles of additional transmission line.

The record, however, indicates much more than just parallel activity. We cannot

---

immunity doctrine, see *Bates v. State Bar of Arizona,* 1977, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810; *Cantor v. Detroit Edison Co.,* 1976, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141; *Goldfarb v. Virginia State Bar,* 1975, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572; *Parker v. Brown,* 1943, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315. The most recent Supreme Court decision on the doctrine is *City of Lafayette v. Louisiana Power & Light,* 1978, —— U.S. ——, 98 S.Ct. 1123, 55 L.Ed.2d 364.

11.  Although it could be argued that retail territorial agreements avoid economic waste by preventing competing power companies from

running electric lines to every house, commentators have favored more competition in the sale of power at wholesale to municipal distribution systems. *See* Weiss, *Antitrust in the Electric Power Industry* 135, 170–71 in Promoting Competition in Regulated Industries (A. Phillips ed. 1975); Meeks, *Concentration in the Electric Power Industry: The Impact of Antitrust Policy,* 72 Colum.L.Rev. 64, 120, 125 (1972).

12.  Gainesville does not challenge the trial court's charge to the jury on this issue or on any other issue.

ignore the continuous exchange of letters between high executives of Florida Power and P&L prior to the events at Gainesville. Although the refusal to serve certain cities may have been influenced by valid economic considerations, the inferences are irresistible that "concerted action was contemplated and invited" by the correspondence. *Interstate Circuit v. United States, supra,* 306 U.S. at 226, 59 S.Ct. at 474, 83 L.Ed. at 620. Indeed, if solid economic reasons existed for refusing service to these cities, there was no reason for communicating with a competitor about the refusal, and certainly not for expressing such decisions in terms of hopeful, if not expected, reciprocity.

■ This correspondence is a so-called plus factor,[13] which, in addition to parallel activity, points so strongly to the existence of a conspiracy that "reasonable men could not arrive at a contrary verdict . . . ." *Boeing Co. v. Shipman,* 5 Cir., 1969, 411 F.2d 365, 374 (en banc). In fact, the letters and internal memoranda border on a blatant agreement to divide the market.[14]

The text of P&L's brief does not even mention the critical exchange of letters between these ostensible competitors prior to the events at Gainesville. Justification for the "routine" is relegated to a footnote. P&L argues that due to the long standing antipathy between investor-owned utilities and the municipal systems, "[e]ach company was interested in whether municipalities it served at franchise were considering 'going municipal.'" P&L then asserts, without giving any example, that "in several instances, the initial contact from the municipality had been by letter showing copies to the other company." It concluded that it was only "common courtesy" to send copies in return.

Oddly enough, P&L's justification for its "routine" letter exchange is dangerously close to an admission that it was common practice for the investor-owned companies to gang up on the municipals. In any event, it is incorrect that this exchange occurred only when cities were considering going municipal. Chiefland and Lake City, for example, were considering switching from one power company to another.

As for Gainesville, P&L again defends its reluctance to interconnect on economic grounds arguing that the cost would be prohibitive. Gainesville questions the estimate and points out that the higher cost, if any, goes to the terms of the agreement, not whether there should be an offer to interconnect. In any event, in view of the correspondence on other cities, we believe the treatment Gainesville received compels the inference that a continuing conspiracy existed to divide the market.

In 1965, when Florida Power's vice-president wrote P&L requesting comments prior to filing a response to the FPC, he made it clear that his company was inviting cooperation and coordinated action, as had occurred on other cities. Then, when William Clapp, Florida Power's president, wrote the

---

**13.** *Cf. Volasco Products Co. v. Lloyd A. Fry Roofing Co.,* 6 Cir., 1962, 308 F.2d 383, *cert. denied,* 1963, 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (parallel pricing together with evidence of meetings of industry leaders supported conspiracy verdict); *Pittsburgh Plate Glass Co. v. United States,* 4 Cir., 1958, 260 F.2d 397, *aff'd,* 1959, 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (simultaneous announcements of identical price rises subsequent to meeting upheld finding of conspiracy); *Standard Oil Co. v. Moore,* 9 Cir., 1957, 251 F.2d 188, 204–12, *cert. denied,* 1958, 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (exchange of information on dealer price cutting, along with parallel practices, supported verdict); *C–O–Two Fire Equipment Co. v. United States,* 9 Cir., 1952, 197 F.2d 489, 497, *cert. denied,* 344 U.S. 892, 73 S.Ct. 211, 97 L.Ed. 690 (parallel pricing plus background of illegal licensing agreements, an artificial standardization of the product, and the raising of prices in time of surplus supported jury verdict). *See generally* L. Sullivan, Handbook of the Law of Antitrust 315–19 (1977).

**14.** The officials of the power companies deny the existence of a territorial agreement, but "[w]here such testimony is in conflict with contemporaneous documents we can give it little weight, particularly when the crucial issues involve mixed questions of law and fact." *United States v. U. S. Gypsum Co.,* 1948, 333 U.S. 364, 396, 68 S.Ct. 525, 542, 92 L.Ed. 746, 766. *See also United States v. General Motors Corp.,* 1966, 384 U.S. 127, 142 n. 16, 86 S.Ct. 1321, 1328–1329 n. 16, 16 L.Ed.2d 415, 424 n. 16.

FPC, he specifically opposed any intertie between Gainesville and his company, as well as between the City and P&L, because of the purported territorial agreement, further indicating he expected cooperative action vis-a-vis the City. And knowing full well its cooperation was solicited and indeed was essential, P&L, in its answer to the FPC, failed to disclaim any territorial understanding with Florida Power, and actively supported and cooperated with Clapp by urging that Gainesville negotiate with Florida Power.

Fite even testified at trial that both he and Clapp knew that the agreements on file with the Florida Public Service Commission did not pertain to the Gainesville area.[15] Moreover, Fite said that Clapp's letter had referred to territorial agreements "on file" only to "scare off" the FPC and Gainesville.[16] One word from P&L would have undone the scheme, and yet, understanding Clapp's purpose and knowing "that cooperation was essential to successful operation of the plan," Fite gave his "adherence to the scheme and participated in it." *Interstate Circuit v. United States, supra,* 306 U.S. at 226, 59 S.Ct. at 474, 83 L.Ed. at 620.

The scenario was repeated the next year when Gainesville approached P&L about an interconnection. Fite first directed Gainesville back to Florida Power: "[A]ny tie with Gainesville should necessarily be one with Florida Power." Px 12. When this approach failed and the City persisted in pursuing an interconnection, Fite pointed out that in his view "three parties are involved," and Gainesville would have to agree to a territorial division at the retail level with Florida Power. Px 14.

P&L contends that Fite's last letter to Kelly, the director of the Gainesville system, did not expressly say that a service area agreement was required. Fite only asked for Kelly's comments on the matter. P&L also argues it never refused to interconnect with Gainesville. We believe, however, that the ambiguous reply was a mere subterfuge is demonstrated by the explanation given by Alan Wright of P & L in an internal memorandum to Fite:

> [M]y impression from Mr. Kelly's comments [in his letter of October 10] is that he is only trying to secure some kind of commitment from us which could prove not only embarrassing to Florida Power Corporation but would also "put us in a box". In other words, any type of definitive reply on our part would only be used as a club.

Px 412. Thus, P&L resisted giving a "definitive reply" out of its desire to help Florida Power. Although such a desire is admirable between friends, it is highly suspicious between competitors.

Furthermore, the concentration of the electric power industry in Florida supports our holding that a conspiracy to divide the market existed. Besides P&L and Florida Power, the City Commission discussed four other interconnection possibilities, but for all practical purposes, the two largest electric power companies in Florida were the only real alternatives. Indeed, P&L argues that Florida Power was the sole practical choice.[17]

---

**15.** R., vol. 19, at 156 ("I knew it, and he knew it").

**16.** During trial, Fite testified:
I think [Clapp] is honest, but I think—
I think he thought may be that might scare them a little bit, see.

    \*    \*    \*    \*    \*    \*

Q. You think he put that reference to 'on file' in there perhaps to scare off Gainesville or the Federal Power Commission or somebody?
A. That's my opinion.
R., vol. 19, at 154–55.

**17.** The City Commission had discussed Clay Electric Cooperative, Starke's municipal system, Jacksonville's municipal system, and the Yankee-Dixie organization, which was an abortive attempt to interconnect all municipal systems. R., vol. 6, at 75 (testimony of Commissioner Richardson); R., vol. 18, at 163 (testimony of Commissioner Turlington). Clay Electric and Starke, however, were too small to give Gainesville any help on an interconnection. Clay, also, was already interconnected to Florida Power, and if that company would not sell power to Gainesville it was unlikely it would sell to Gainesville through Clay. *Id.* Jacksonville's lines were farther from the City than either P&L or Florida Power. However, John Kelly, director of the Gainesville system, had suggested that if Gainesville could interconnect

■ We realize that some courts have been reluctant to find a conspiracy in such a concentrated market,[18] but the Supreme Court, in determining if the exchange of price information was illegal, has considered whether an industry was "dominated by relatively few sellers." *United States v. Container Corp. of America*, 1969, 393 U.S. 333, 337, 89 S.Ct. 510, 512, 21 L.Ed.2d 526, 527. Economists recognize that when a market is concentrated it is easier to coordinate collusive behavior. E. g., F. Scherer, Industrial Market Structure and Economic Performance 183–86 (1970). To establish a market division among fifty firms, for example, a written document may be necessary. But when only two companies dominate a market, it is unlikely any formal agreement is needed or would be risked. In a concentrated market, therefore, we believe a court should carefully scrutinize firms to see if their conduct or any communication among them supports or requires a finding of conspiracy. *See generally* Posner, *Oligopoly and the Antitrust Laws: A Suggested Approach*, 21 Stan.L.Rev. 1562 (1969). In this case, the incriminating correspondence between the two largest electric power companies in Florida warrants such a finding.[19]

### What's Open On Remand

■ Gainesville, in addition, argues that the trial court's denial of a judgment n. o. v. should be reversed on its § 1 claim that an understanding existed between P&L and Florida Power whereby neither would interconnect with Gainesville unless the City would enter into a retail territorial agreement. We sustain, however, the trial court's refusal to grant judgment n. o. v. on this issue, and on remand, questions 3 and 4 are foreclosed. See Appendix.

As an anchor windward, Gainesville also does not abandon its mild suggestion that judgment n. o. v. should have been granted on its § 2 attempt to monopolize argument based on the asserted imposition of a retail territorial restriction as a condition of interconnection. But with respect to the sufficiency of the evidence, we find no basis to reverse on this issue. Thus, on remand, questions 8 thru 14 are foreclosed. See Appendix. We also point out that the jury's negative answer to question 8, which we sustain, does not prevent reconsideration of the § 1 claim on the existence of an understanding to divide the wholesale power market. With meticulous care, the trial court instructed the jury that questions 8 to 14 pertained to the completely different § 2 monopoly theory of liability. Gainesville claimed under this theory that the specific act which furthered the attempt to monopolize was P&L's alleged refusal to interconnect unless Gainesville agreed to a retail territorial agreement. See Appendix (Question 9). This contention is unrelated to the existence of a conspiracy to divide the wholesale power market.

Finally, Gainesville contends it should be granted a new trial on all issues because three prospective jurors should have been excused for cause; the trial judge made prejudicial remarks; and certain testimony was erroneously admitted. We find, however, no basis independent of the jury's verdict to reverse on these grounds.

In sum, we base our reversal solely on the existence of an "agreement, understanding or concert of action" between P&L and Florida Power whereby P&L would not deal with Gainesville because the City was in

---

with P&L then power could be transferred from Jacksonville to Gainesville since P&L and Jacksonville were interconnected. Px 5 at 4.

18. *See, e. g., Delaware Valley Marine Supply Co. v. American Tobacco Co.*, 3 Cir., 1961, 297 F.2d 199, 202, *cert. denied*, 369 U.S. 839, 82 S.Ct. 867, 7 L.Ed.2d 843 ("we are aware of the difficulties of proof of modern antitrust conspiracy and that the difficulties increase as the number of conspirators lessens").

19. We do not reach the question of whether the interdependence of firms, i. e., decision making based on the anticipated reactions of other firms in an oligopolistic market, is sufficient to constitute a violation of § 1. *See Bogosian v. Gulf Oil Corp.*, 3 Cir., 1977, 561 F.2d 434, 444–47, *cert. denied*, 1978, —— U.S. ——, 98 S.Ct. 1280, 55 L.Ed.2d 791. We hold only that where a market is dominated by a small number of sellers collusion is easier, and a court should examine the market with a more careful eye.

Florida Power's territory. On remand, the issue reflected in question 2 on whether the territorial agreement was a significant factor in Gainesville's not having obtained an interconnection is still open, as are the damage issues reflected in questions 5, 6, and 7.

REVERSED and REMANDED.

## APPENDIX

The fourteen special verdict questions, along with the instructions and the jury's answers, are as follows:

1.  DO YOU FIND BY A PREPONDERANCE OF THE EVIDENCE THAT THERE WAS AN AGREEMENT, UNDERSTANDING OR CONCERT OF ACTION BETWEEN POWER & LIGHT AND FLORIDA POWER WHEREBY POWER & LIGHT WOULD NOT DEAL WITH GAINESVILLE THROUGH AN INTERCONNECTION BECAUSE GAINESVILLE WAS IN FLORIDA POWER'S SERVICE TERRITORY?

    Answer by writing Yes or No. [No] If your answer is No, do not consider or answer question 2, but instead proceed to question 3 which you shall answer. If your answer is Yes, proceed to question No. 2.

2.  DO YOU FIND BY A PREPONDERANCE OF THE EVIDENCE THAT THE AGREEMENT, UNDERSTANDING OR CONCERT OF ACTION BETWEEN POWER & LIGHT AND FLORIDA POWER WAS A SUBSTANTIAL FACTOR IN GAINESVILLE'S NOT HAVING OBTAINED AN INTERCONNECTION?

    Answer by writing Yes or No. _____ Whatever your answer, proceed to question No. 3. If your answer is Yes, you will proceed to question 5 in addition to question 3.

3.  DO YOU FIND BY A PREPONDERANCE OF THE EVIDENCE THAT THERE WAS AN AGREEMENT, UNDERSTANDING OR CONCERT OF ACTION BETWEEN POWER &

LIGHT AND FLORIDA POWER WHEREBY NEITHER WOULD INTERCONNECT WITH GAINESVILLE UNLESS THE CITY WOULD ENTER INTO A TERRITORIAL AGREEMENT?

Answer by writing Yes or No. [No] If your answer is No, and your answer to question 1 or 2 is also No, do not consider or answer questions 4 through 7, but, instead, proceed to question 8 which you shall answer. If your answer to question 3 is Yes, proceed to question 4.

4.  DO YOU FIND A PREPONDERANCE OF THE EVIDENCE THAT THE AGREEMENT, UNDERSTANDING OR CONCERT OF ACTION BETWEEN POWER & LIGHT AND FLORIDA POWER WAS A SUBSTANTIAL FACTOR IN GAINESVILLE'S NOT HAVING OBTAINED AN INTERCONNECTION?

    Answer by writing Yes or No. _____ If your answer to this question is No, and your answer to question 1 or 2 is No, do not consider or answer questions 5 through 7, but, instead, proceed to question 8 which you shall answer. However, if your answer to question 2 or 4, or both, is Yes, proceed to question 5 which you shall answer.

5.  DO YOU FIND BY A PREPONDERANCE OF THE EVIDENCE THAT NOT HAVING OBTAINED AN INTERCONNECTION AGREEMENT AT ANY TIME PRIOR TO APRIL 1, 1968 WAS A SUBSTANTIAL FACTOR IN THE DECISION OF THE GAINESVILLE CITY COMMISSION TO INSTALL A 76MW UNIT INSTEAD OF A 94MW REHEAT UNIT?

    Answer by writing Yes or No. _____ If your answer is Yes, proceed to questions 6 and 7. If your answer is No, do not consider or answer questions 6, but instead, proceed to question 7.

6.  DO YOU FIND BY A PREPONDERANCE OF THE EVIDENCE THAT GAINESVILLE SUFFERED ANY

DAMAGES AS A RESULT OF IN-CREASED FUEL COSTS BECAUSE IT INSTALLED THE 76MW UNIT INSTEAD OF THE 94MW REHEAT UNIT AND, IF SO, WHAT IS THE AMOUNT OF ITS DAMAGES FOR SUCH INCREASED FUEL COSTS? $_____.

7. DO YOU FIND BY A PREPONDER-ANCE OF THE EVIDENCE THAT GAINESVILLE SUFFERED ANY DAMAGES, EXCLUSIVE OF ANY INCREASED FUEL COSTS, AND, IF SO, WHAT IS THE AMOUNT OF SUCH DAMAGES? $_____.

Proceed to question No. 8.

8. DO YOU FIND BY A PREPONDER-ANCE OF THE EVIDENCE THAT GAINESVILLE SOUGHT AN IN-TERCONNECTION FROM POWER & LIGHT?

Answer by writing Yes or No. [No] If your answer is No, do not consider or answer any further questions. If your answer is Yes, proceed to question 9.

9. DO YOU FIND BY A PREPONDER-ANCE OF THE EVIDENCE THAT POWER & LIGHT REFUSED TO IN-TERCONNECT WITH GAINES-VILLE WITHOUT A TERRITORIAL AGREEMENT?

Answer by writing Yes or No. _____ If your answer is No, do not consider or answer any further questions. If your answer is Yes, proceed to question 10.

10. DO YOU FIND BY A PREPONDER-ANCE OF THE EVIDENCE THAT POWER & LIGHT, AT THE TIME IT REFUSED INTERCONNECTION, WAS ATTEMPTING TO MONOPO-LIZE THE SALE AND DISTRIBU-TION OF ELECTRIC POWER IN A RELEVANT MARKET?

Answer by writing Yes or No. _____ If your answer is No, do not consider or answer any further questions. If your answer is Yes, proceed to question 11.

11. DO YOU FIND BY A PREPONDER-ANCE OF THE EVIDENCE THAT POWER & LIGHT'S REFUSAL TO INTERCONNECT WAS IN FUR-THERANCE OF ITS ATTEMPT TO MONOPOLIZE?

Answer by writing Yes or No. _____ If your answer is No, do not consider or answer any further questions. If your answer is Yes, proceed to question 12.

12. DO YOU FIND BY A PREPONDER-ANCE OF THE EVIDENCE THAT NOT HAVING OBTAINED AN IN-TERCONNECTION WITH POWER & LIGHT AT ANY TIME PRIOR TO APRIL 1, 1968 WAS A SUBSTAN-TIAL FACTOR IN THE DECISION OF THE GAINESVILLE CITY COM-MISSION TO INSTALL A 76MW UNIT INSTEAD OF A 94MW RE-HEAT UNIT?

Answer in writing Yes or No. _____ If your answer is Yes, proceed to ques-tions 13 and 14. If your answer is No, do not consider or answer questions 13 and 14.

13. DO YOU FIND BY A PREPONDER-ANCE OF THE EVIDENCE THAT GAINESVILLE SUFFERED ANY DAMAGES AS A RESULT OF IN-CREASED FUEL COSTS BECAUSE IT INSTALLED THE 76MW UNIT INSTEAD OF THE 94MW REHEAT UNIT AND, IF SO, WHAT IS THE AMOUNT OF ITS DAMAGES FOR SUCH INCREASED FUEL COSTS. $_____.

14. DO YOU FIND BY A PREPONDER-ANCE OF THE EVIDENCE THAT GAINESVILLE SUFFERED ANY DAMAGES, EXCLUSIVE OF ANY INCREASED FUEL COSTS, AND, IF SO, WHAT IS THE AMOUNT OF SUCH DAMAGES? $_____.