Daniel S. KAMPEL and Clarisse Kampel, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

Docket No. 80–4020.

United States Court of Appeals, Second Circuit.

Argued Sept. 29, 1980.

Decided Nov. 25, 1980.

Eugene L. Vogel, New York City (Marc E. Nitsche and Rosenman, Colin, Freund, Lewis & Cohen, New York City, on the brief), for petitioners–appellants.

James A. Riedy, Atty., Tax Division, Dept. of Justice, Washington, D. C. (M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews and David English Carmack, Attys., Tax Division, Dept. of Justice, Washington, D. C., on the brief), for respondent–appellee.

Before LUMBARD, OAKES and NEWMAN, Circuit Judges.

NEWMAN, Circuit Judge:

This appeal involves the narrow question whether guaranteed partnership income, viewed as salary by Internal Revenue Code § 707(c), is subject to the limits on taxation of earned income imposed by Code § 1348, for tax years prior to 1978.[1] The taxpayer–appellant treated all of his § 707(c) payments as earned income in order to receive the more favorable 50% maximum tax rate of § 1348. However, under Treasury Regulation § 1.1348–3(a)(3)(i), all § 707(c) payments, despite their salary characterization, must be included in a taxpayer's aggregate partnership income, of which no more than 30% is eligible to be treated as earned income and hence subject to the 50% maximum tax rate. Using the regulation's computation method, the Commissioner assessed a deficiency against the taxpayer. The Tax Court adopted the Commissioner's position and upheld the validity of the regulation. *Kampel v. Commissioner*, 72 T.C. 827 (1979). We affirm the judgment of the Tax Court.

I

The taxpayer–appellant, Daniel S. Kampel, in the tax year in question, 1973, was a partner in a brokerage firm. He was also manager of the firm's pension fund department. For the three years prior to becoming a partner in 1966, Kampel, as an employee of the partnership, had held the same managerial position. Thus both before and after becoming a partner he performed substantially the same services and received compensation for those services computed in substantially the same manner. Appellant's compensation arrangement for these managerial services did not specify a fixed dollar figure but instead used a formula by which his income depended upon his productivity and that of the department; his compensation under this arrangement in 1973 was $379,000. In 1973 Kampel also received from the partnership a distributive share of the partnership's profits of $45,000 and $32,000 of interest on capital he had contributed to the partnership.

These facts brought into play three provisions of the Code: §§ 707(c), 911(b), and 1348. Section 707(c) provides that if payments from a partnership to a partner for services rendered are "determined without regard to the income of the partnership," such "guaranteed" payments shall be treated as salary and not as partnership

---

1. The Revenue Act of 1978, Pub.L.No.95–600, 92 Stat. 2763, amended § 1348 with the effect of resolving in part the problem raised in this appeal for tax years beginning after the effective date of the amendment, December 31, 1978, by eliminating operation of the 30% earned income allocation rule of § 911(b) for § 1348 purposes. Section 442, *id.*; 92 Stat. at 2878.

share.[2] The parties stipulated that the payment of $379,000 Kampel received for managing the pension fund department was "determined without regard to the income of the partnership."[3] Section 707(c) also provides that guaranteed payments are to be considered as salary "but only" for purposes of § 61(a), relating to gross income, and § 162(a), relating to business expenses. Section 911(b) defines "earned income" to include salary, but it also provides a special rule applicable to net profits received from a business, like Kampel's brokerage firm, in which both personal services and capital are material income–producing factors: no more than 30% of a taxpayer's share of net profits from such a business may be treated as compensation for personal services and hence considered as "earned income."[4] Section 1348 provides a 50% maximum tax rate for "personal service income," which this provision defines to mean any "earned income" within the meaning of § 911(b).[5]

In computing his income tax liability for 1973, appellant treated as earned income, for the purpose of applying the 50% maximum tax rate of § 1348, the entire $379,000 he received for his managerial services. In considering this entire amount as earned income, Kampel relied upon Code § 707(c) because it characterizes such a guaranteed payment as salary. He also included 30% of his $45,000 distributive share of the firm's profits as earned income, relying on the maximum earned income allocation percentage of § 911(b). Because interest income is not within the definition of earned income, Kampel did not include any portion of the $32,000 of interest he received from the partnership as earned income subject to § 1348's maximum 50% rate.

On audit, the Internal Revenue Service (IRS) determined that appellant's tax liability calculation was erroneous and assessed a deficiency of $39,773.[6] The agency con-

**2.** I.R.C. § 707(c) provides:
(c) *Guaranteed Payments.*–To the extent determined without regard to the income of the partnership, payments to a partner for services or the use of capital shall be considered as made to one who is not a member of the partnership, but only for the purposes of section 61(a) (relating to gross income) and, . . . section 162(a) (relating to trade or business expenses).

**3.** The IRS raised the alternative claim that Kampel's compensation for his managerial services was not a guaranteed payment within the meaning of § 707(c) because it was based on the department's productivity. The Tax Court did not reach this issue because under its reading of the Treasury Regulation in dispute, the Commissioner's computation of Kampel's tax liability was correct even if the taxpayer had received a guaranteed payment. *Kampel v. Commissioner*, 72 T.C. 827, 830 n.3 (1979). While we adopt the Tax Court's approach and hence also need not reach this issue, we note that the parties expressly stipulated that Kampel's compensation as manager was "determined without regard to the income of the partnership," *id.* at 828–29, language that precisely tracks the statutory definition of a § 707(c) payment. Although the Service presumably did not intend to give away its case, it is difficult to find the alleged ambiguity in this wording. We thus deem the commissioner bound by the stipulation, *see Thrash v. O'Donnell*, 448 F.2d 886, 889 n.7 (5th Cir. 1971); *Missouri–Illinois R. Co. v. United States*, 381

F.2d 1001, 1003, 180 Ct.Cl. 1179 (1967) (*per curiam*); *United States v. 237,500 Acres of Land*, 236 F.Supp. 44, 46 (S.D.Cal.1964), and consider the payments as guaranteed within the meaning of § 707(c).

**4.** I.R.C. § 911(b) provides, in pertinent part:
(b) Definition of earned income–
[T]he term "earned income" means . . . salaries . . . received as compensation for personal services actually rendered. . . . In the case of a taxpayer engaged in a trade or business in which both personal services and capital are material income–producing factors, under regulations prescribed by the Secretary, a reasonable allowance as compensation for the personal services rendered by the taxpayer, not in excess of 30 percent of his share of the net profits of such trade or business, shall be considered as earned income.

**5.** I.R.C. § 1348 incorporates by reference the definition of earned income in § 911(b):
§ 1348 fifty–percent maximum rate on personal service income
(b) *Definitions.*–For purposes of this section–
(1) *Personal service income.*–The term "personal service income" means any income which is earned income within the meaning of . . . section 911(b). . . .

**6.** In the notice of deficiency the Commissioner had determined that Kampel's total 1973 partnership income was $284,176, and had applied

tended that the proper treatment under § 1348, as specified by Treasury Regulation § 1.1348–3(a)(3)(i),[7] was to add the $379,000 of managerial compensation to Kampel's total partnership receipts, the $45,000 profit share and $32,000 of interest, and then apply the 30% limitation to the aggregate sum of $456,000. Under this approach, the taxpayer's earned income, eligible for the maximum 50% rate limitation, cannot exceed 30% of the sum of any guaranteed payments plus all other partnership income received. The regulation thus has the effect of adopting § 911(b)'s income allocation rule in preference to that expressed in § 707(c).

The Tax Court upheld the validity of the regulation and the Commissioner's view that, for the purposes of § 1348, "earned income" is limited to 30% of the sum of the guaranteed payments and net profits, despite § 707(c)'s characterization of the entire guaranteed payment as salary. The linchpin in the analysis was the language of § 707(c), allowing salary treatment "but only for the purpose of section 61(a) (relat-

ing to gross income) and section 162(a) (relating to trade or business expenses)." The Court adopted the Commissioner's position that this proviso expressly prevents § 707(c) from making payments eligible in their entirety for § 1348's maximum 50% rate limitation because § 1348 does not affect the determination of either §§ 61(a) or 162(a), but solely modifies the tax rates imposed by § 1. Consequently, the Court found that the regulation did not conflict with the statutory scheme and embodied a reasonable interpretation of § 1348.

## II

■ The standard for reviewing a treasury regulation is one of reasonableness: a regulation is to be sustained unless it is unreasonable and plainly inconsistent with the statute. *Commissioner v. South Texas Co.*, 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1948). The Tax Court found that Treasury Regulation § 1.1348–

---

the maximum 50% tax to 30% of this amount, or $85,253. Before the Tax Court, the Commissioner conceded that this determination was incorrect and applied the maximum tax to 30% of $456,867.86, or $133,766. *Kampel v. Commissioner, supra*, 72 T.C. at 830 n.2.

7. Treas.Reg. § 1.1348–3 *Definitions.*
*Earned income–*
    * * * * * *
(3) *Earned income from business in which capital is material.*
(i) If an individual is engaged in a trade or business (other than in corporate form) in which both personal services and capital are material income–producing factors, a reasonable allowance as compensation for the personal services actually rendered by the individual shall be considered earned income, but the total amount which shall be treated as the earned income of the individual from such a trade or business shall in no case exceed 30 percent of his share of the net profits of such trade or business (which share shall include any guaranteed payment (as defined by § 1.707–1(c) received from a partnership).
Treasury Regulation § 1.707–1(c), cross–referenced in Treasury Regulation § 1.348–3(a)(3)(i), was promulgated under Code § 707(c), and states:
    Treas.Reg. § 1.707–1 *Transactions between partner and partnership.*
    * * * * * *

(c) *Guaranteed payments.* Payments made by a partnership to a partner for services or for the use of capital are considered as made to a person who is not a partner, to the extent such payments are determined without regard to the income of the partnership. However, a partner must include such payments as ordinary income for his taxable year within or with which ends the partnership taxable year in which the partnership deducted such payments as paid or accrued under its method of accounting. See section 706(a) and paragraph (a) of § 1.706–1. Guaranteed payments are considered as made to one who is not a member of the partnership only for the purposes of section 61(a) (relating to gross income) and section 162(a) (relating to trade or business expenses). They do not constitute an interest in partnership profits for purposes of sections 706(b)(3), 707(b), and 708(b). For the purposes of other provisions of the internal revenue laws, guaranteed payments are regarded as a partner's distributive share of ordinary income. Thus, a partner who receives guaranteed payments for a period during which he is absent from work because of personal injuries or sickness is not entitled to exclude such payments from his gross income under section 105(d). Similarly, a partner who receives guaranteed payments is not regarded as an employee of the partnership for the purposes of withholding of tax at source, deferred compensation plans, etc. * * *

3(a)(3)(i) [8] was a reasonable interpretation of § 1348 because it simply followed the definitional requirement of § 911(b), which is incorporated by reference in § 1348. As these statutes are silent about the apparently conflicting characterization in § 707(c) with respect to payments within its coverage as salary and not share, the Court stressed the limiting language of § 707(c) as operating only for the purposes of §§ 61(a) and 162(a). It also found that neither § 911(b) nor § 1348 implied that § 707(c) payments could be exempted from the strict 30% rule for income from a trade or business covered by § 911(b). As he argued to the Tax Court, appellant challenges the regulation's validity, principally on the grounds of its conflict with § 707(c), the legislative history, and cases construing the scope of that section.[9]

Section 707(c) adopts an entity approach to partnership taxation, as opposed to the traditional theory that views a partnership as an aggregate of individuals. H.R.Rep. No.1337, 83d Cong., 2d Sess., *reprinted in* [1954] U.S.Code Cong. & Ad.News, pp. 4017, 4093. Recognizing that partners may act in different capacities with respect to their partnership for purposes of tax treatment, it allows partners to treat as ordinary personal service income–salary to an "employee"–guaranteed payments determined without regard to the income of the partnership, rather than requiring their treatment as part of the partner's share of the partnership profits. The partnership, correspondingly, can deduct such payments as business expenses. On its face, the section's view of income coming within its scope conflicts with the approach of Treasury Regulation § 1.1348–3(a)(3)(i). Appellant stresses this role–defining aspect of § 707(c) to compel earned income treatment of his compensation.

**8.** As was pointed out at oral argument, the regulations under § 1348 were not adopted until December 14, 1976, three years after the tax year in question. It was proposed, however, on December 15, 1971, and as printed in the Federal Register of that date, differs insignificantly from the regulation finally promulgated. 36 Fed.Reg. 23814, 23817 (1971). Thus, if in assessing its validity we were concerned about notice to the taxpayer regarding the Commissioner's position on guaranteed payments for the purposes of the maximum tax on earned income, the prior publication of the proposed regulation would alleviate that concern. Indeed, the regulations specifying the limited extent to which the characterization of income in § 707(c) applies to other Code sections were promulgated well before the tax year in this case; Treasury Regulation ·§ 1.707–1(c) was approved on May 23, 1956, and has undergone only negligible modification since that time. But in any case, the date of the regulation is not relevant to our ultimate finding of the validity of the Commissioner's position and the regulation's mode of resolving the allocation rule conflict within the Code.

**9.** Appellant also contends that the ambiguity of the regulation suggests several alternative interpretations that support his mode of computing his tax liability. We find these contentions to be without merit. He claims that the regulation does not apply to him because under § 707(c) he is an employee and not a partner, and in that capacity, his business is managing the fund, a business in which only personal services, and not capital, is a material income–producing factor. Although we agree with ap-

pellant that such a characterization would not remove, as the Service prophesied, all partners who receive guaranteed payments from the scope of the regulation, we reject this interpretation for focusing on the wrong level at which business is defined by the Code. Section 707(c) distinguishes the partner's status with respect to transactions with his partnership only for purposes of characterizing the payments thereby received and does not affect the business characterization of the underlying enterprise, which is the focus of the regulation. Operation of the 30% limit depends on the entity paying the taxpayer and not the nature of the taxpayer's activities within that entity.

Kampel further argues that the regulation may mean that the entire § 707(c) guaranteed payment constitutes the taxpayer's earned income under § 1348 but that nothing more of his partnership income should be so treated if the guaranteed payment exceeds 30% of the partnership share. The parenthetical reference to § 707(c) payments would thus become an ordering device for applying the maximum tax. Although this may in fact be a very sensible approach to determining earned income in these cases, the clear grammatical structure of the regulation does not allow such a construction. The regulation limits application of § 1348 by a percentage of the partnership share and not by the amount of the guaranteed payment; the guaranteed payment is thus included in the regulation solely to define the share to which the limit applies, not to determine, or create an alternative to, the limit.

The purpose of § 707(c), however, does not support appellant's claim. The section was adopted to eliminate the confusing, complicated tax treatment of partner compensation under the then existing law, caused by the aggregate approach to partnerships, whereby complex accounting problems arose when the partnership's earnings were insufficient to cover the compensation the partner had received. H.R.Rep.No. 1337, *supra*, at 4094. Before the section was adopted in 1954, salary in those instances was treated as a return on capital so that the partner reported no taxable income except when his salary exceeded his capital contribution; in such a case, the taxable amount had to be allocated among the capital of the other partners, who would be entitled to deductions for their share of those payments. See *Augustine M. Lloyd*, 15 B.T.A. 82 (1929). Congress expressly intended to end this complexity in partnership tax treatment by enacting § 707(c). H.R.Rep.No.1337, *supra*, at 4094; S.Rep.No. 1622, 83d Cong., 2d Sess., *reprinted in* [1954] U.S.Code Cong. & Ad.News, pp. 4621, 4725. Although the section does serve to recognize and define the different statuses partners may hold in relation to their partnership for tax purposes, its primary objective in creating an income characterization rule was thus only tangentially related to distinguishing among a partner's roles, and was more directly concerned with improving accounting practices.

■ The critical interpretative issue in this case is not the general purpose of § 707(c)'s entity approach to partnership transactions, but rather the meaning of the

section's "but only" proviso. The Commissioner finds within that wording a clear congressional intent that § 707(c)'s salary characterization be narrowly restricted with respect to the rest of the Code. The legislative history, however, suggests a different explanation for this particular clause, and three courts have rejected the Commissioner's interpretation and held that § 707(c)'s salary treatment is applicable to Code sections other than just §§ 61(a) and 162(a), see *Armstrong v. Phinney*, 394 F.2d 661 (5th Cir. 1968); *Carey v. United States*, 427 F.2d 763, 192 Ct.Cl. 536 (1970); *Andrew O. Miller, Jr.*, 52 T.C. 752 (1969), acq. 1972–2 C.B. 2.

Clearly a § 707(c) guaranteed payment, whether characterized as salary or as partnership profits share, would be includable in gross income as defined by § 61(a) by virtue of the latter section's own terms. See I.R.C. § 61(a)(1) (compensation for services); *id.* § 61(a)(13) (distributive share of partnership gross income). The proviso in § 707(c) is therefore difficult to construe because its explicit connection to § 61(a) adds nothing. The most reasonable explanation for Congress's use of the phrase is, as suggested by the legislative materials, that it was intended to reinforce the point made in § 706 that the tax year of the partner receiving the salary income–covered by § 61(a)–and that of the partnership deducting those payments–covered by § 162(a)–must be the same. See S.Rep.No.1622, *supra*, at 4726 (referring to § 707(c) "treatment" for purposes of §§ 61(a) and 162(a) only, in immediate context of discussion of accounting treatment according to partnership year).[10]

---

**10.** In this respect we disagree with the Tax Court's interpretation of this passage in the legislative history. The Senate Report states, with respect to § 707(c):

In the case of guaranteed salary payments your committee followed the House bill but made it clear that such income is to be reported for tax purposes at the end of the partnership year in which it is paid and that *this treatment* is only provided for the purposes of the reporting of the income by the partner and the deducting of the payments by the partnership. S.Rep.No.1622, 83d Cong., 2d Sess., *reprinted in* [1954] U.S.Code

Cong. & Ad.News, pp. 4621, 4726–27 [Emphasis added].

The Tax Court interpreted the phrase "this treatment" to refer to the section's characterization of income as salary and not share, in order to support its view that the salary characterization was limited only to §§ 61(a) and 162(a). *Kampel v. Commissioner, supra*, 72 T.C. at 834 n.8. We agree with appellant that the preceding sentence only discusses the accounting treatment of § 707(c) payments and the timing problem, which was one of the major modifications made by the Senate in its revision of the House version of the partnership

Although timing for income reporting may very well be the intention underlying inclusion of the proviso, the broad language chosen for its expression encompasses more than that accounting problem. Accordingly courts rejecting a literal approach to the section's restriction on the availability of § 707(c) treatment have read the proviso either to refer solely to the accounting problem of the timing of income–reporting, *Andrew O. Miller, Jr., supra*, 52 T.C. at 762, or to refer to and make applicable all other provisions of subtitle A of the Code; this latter reading is based on the fact that § 61(a), one of the two sections to which § 707(c) extends under the proviso, begins with the clause "[e]xcept as otherwise provided in this subtitle, gross income means . . . ." *Armstrong v. Phinney, supra*, 394 F.2d at 664 n.10; *Carey v. United States, supra*, 427 F.2d at 766–67. Although we would hesitate to adopt the broad reading of the proviso adopted in *Phinney* and *Carey*, we need not decide the issue because if § 61(a) absorbs § 1348 for the purposes of § 707(c) treatment, then it equally includes § 911(b).

The essence of this case is reconciliation of two competing allocation rules: § 911(b), which limits earned income from partnerships in which both personal services and capital are material income–producing factors to 30% of all income received; and § 707(c), which, by defining guaranteed payments as salary, functions as an alternative allocation rule for such businesses by directing all partnership income falling within its coverage to be attributed to personal services. The issue, as we see it, is which allocation rule controls for the purposes of applying § 1348. In our view, while the § 707(c) characterization of guaranteed payments may well have wider application beyond just aligning the tax years of diverse taxpayers under §§ 61(a) and 162(a), it does not displace the 30% allocation limitation of § 911(b).[11] At the very least, that is a reasonable conclusion the Treasury was entitled to reach in promulgating Regulation § 1.1348–3(a)(3)(i).

The structure and legislative history of § 911(b) show an unambiguous intention to create an income allocation rule for the IRS. The definition of earned income in § 911(b) originated in a provision of the Revenue Act of 1924 enacted to impose a lower tax rate on all earned income and amended on the floor to aid farmers and small businesses by eliminating an initial tax preference to incorporated entities not subject to an earned income limitation. 65 Cong.Rec. 2849 (1924). A specified percentage limitation (then 20%) was adopted to reduce the administrative difficulties inherent in determining a reasonable allowance for personal services in businesses in which both personal services and capital were material income–producing factors; rather than simply have the Service apply a "reasonable allowance" standard, the House expressly enacted an arbitrary percentage limitation as the more administratively

transaction provisions. The need for a timing provision had arisen because of the possibilities of mismatching of income and deductions, and the delayed realization of income by partners, due to differences in tax years of partners and their partnerships. The better view of the significance of this passage for construing § 707(c) is that the adjective "this" modifying "treatment" refers to the timing of income reporting and not its income characterization, a factor that would be relevant only to §§ 61(a) and 162(a). The Tax Court in *Andrew O. Miller, Jr.*, 52 T.C. 752 (1969), acq. 1972–2 C.B. 2, reached a similar conclusion as to the meaning of this paragraph. *Id.* at 762.

11. Although both § 911(b) and § 707(c) were promulgated in the 1954 Code, § 911(b) predated the Code, while § 707(c) had no counterpart in the prior law. · But this does not lessen the controlling effect of § 911(b) with respect to calculating appellant's earned income. Section 707(c) has no specific displacing language regarding the 30% earned income allocation rule of § 911(b) for businesses in which both personal services and capital are material income–producing factors; it simply does not deal with the allocation questions raised by such types of businesses. It is § 911(b) that deals with and resolves such questions. Moreover, § 1348 was adopted in 1969, after both § 911(b) and § 707(c). Section 1348 expressly incorporated by reference the earned income definition of § 911(b), including the 30% rule, yet made no similar reference to § 707(c) payments received from businesses that would be subject to § 911(b)'s limitation.

workable solution. *Id.* at 2851; *Brewster v. Commissioner*, 473 F.2d 160, 163 & 163 n.4 (D.C.Cir. 1972) (*per curiam*).

The need for the allocation rule embodied in § 911(b) is obviously lessened in the case of a bona fide § 707(c) payment. A valid § 707(c) classification represents a prior determination by the parties of the extent of partnership income attributable to personal services as opposed to capital. Consequently adherence to the income status conferred by § 707(c) could avoid the difficult income allocation problem that the 30% limitation seeks to avoid. But § 707(c) does not create any distinctions according to the nature of the partnership's business in granting employee–salary status,[12] which is the specific focus of § 911(b). We therefore conclude that § 707(c) does not stand as a sufficient allocation mechanism to protect against abuses of tax evasion that could be generated if blanket acceptance were required of taxpayer income arrangements in businesses in which both personal services and capital are material income–producing factors. By holding that the 30% rule of § 911(b) is controlling, an otherwise purely elective aspect regarding earned income is minimized because the determination of the compensation allowance remains in the hands of the Commissioner, who is guided by the 30% figure, and not the taxpayer, who could otherwise contract for a specified level of guaranteed payments.[13]

Of course, in this case, the taxpayer election problem is less compelling because comparatively objective data exist with which to test the reasonableness of the § 707(c) guaranteed payment characterization. Appellant's salary receipts prior to his becoming a partner could be compared to the $379,000 in question to serve as a benchmark against which to gauge the reasonableness of according § 707(c) treatment to the entire sum for § 1348 purposes. Such an approach would have the additional virtue of being consistent with Congress's subsequent repeal of the 30% limitation of § 911(b) for the purposes of § 1348, § 442 of the Revenue Act of 1978, Pub.L.No.95–600, 92 Stat. 2878, ensuring horizontal equity between employees and partners as to tax rates for the same incomes for services rendered.[14] But in so amending the Code, Congress made no reference to § 707(c) or to alleviating any problem posed by it in relation to § 1348. Rather, the drafters of the amendment expressed a desire to remove the existing tax advantage for corporations that were not subject to the limitation over sole proprietorships and partnerships, as well as a need to eliminate definitional problems over a business's net profits engendered by the limitation. S.Rep.No.1263, 95th Cong., 2d Sess. 208, *reprinted in* [1978] U.S.Code Cong. & Ad.News, pp. 6761, 6971. If § 707(c) payments were thought to constitute earned income in their entirety, then the corporate preference of the old law would not have been so striking and partnerships could have avoided the disadvantage by resorting to § 707(c).

Even if we were persuaded to apply retroactively the spirit of the 1978 amendments, the taxpayer would not succeed in this case. The 1978 change merely permits earned income characterization for more than 30% of a partner's share and does not express anything concerning the intended relation of § 707(c) income characterization

---

**12.** Indeed, the cases in which the courts approved extending § 707(c) salary treatment to the foreign source earned income exclusion of § 911 involved partnerships in which both personal services and capital were not material income–producing factors. *See Cary v. United States*, 427 F.2d 763, 192 Ct.Cl. 536 (1970); *Andrew O. Miller, Jr., supra.*

**13.** Of course, the Commissioner can challenge the taxpayer's claim that he has received a § 707(c) payment, *see, e. g., Pratt v. Commissioner*, 64 T.C. 203 (1975), *aff'd*, 550 F.2d 1023 (5th Cir. 1977) (management fees paid according to percent of rentals held not a § 707(c) payment but share of profits).

**14.** The argument for horizontal equity is not particularly compelling under the circumstances of this case because appellant chose to become a partner; the disadvantage of being subjected to a higher tax rate for otherwise similar income–producing efforts is accompanied by the additional compensatory benefits, including power to participate in deciding compensation formulas, derived from the change in status.

to § 1348. Congress did not mandate that a § 707(c) payment must be granted full earned income status, but rather left the IRS to its own devices to determine what would be a reasonable allowance for personal service compensation. See S.Rep.No. 1263, *supra*, at 208, [1978] U.S.Code Cong. & Ad.News at 6971 (stressing individual not permitted by revision to convert passive income on investments into personal service income). Hence the IRS could still validly deny Kampel's attempt to characterize 83% of his partnership income as payment received for personal services, and then adhere to the 30% figure as a far more reasonable allocation.

We affirm the Tax Court's judgment upholding Treasury Regulation § 1.1348–3(a)(3)(i) and its application in this case.[15]

15. Although appellant justifiably notes the inconsistency in the Commissioner's position of including in Kampel's aggregate partnership receipts $32,000 of interest income, which is not earned income, we decline to adjust the assessed deficiency and the Commissioner has not indicated any intention to do so. The interest inclusion serves to mitigate the possibility that Kampel's compensation for personal services may reasonably have exceeded 30% of his share of the partnership's profits.