ROBERT B. ALBRIGHT, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Albright v. Commissioner
Docket No. 9591-82.
United States Tax Court
T.C. Memo 1985-485; 1985 Tax Ct. Memo LEXIS 148; 50 T.C.M. (CCH) 1068; T.C.M. (RIA) 85485; September 17, 1985. Bruce R. Lowry and James H. Stethem, for the petitioner. Mary H. Weber, for the respondent. GERBER
MEMORANDUM OPINION GERBER, Judge:* Respondent determined a deficiency in petitioner's Federal income tax of $16,588.88 for 1977 and $77,096.92 for 1978. The issues for decision are: (1) Whether capital was a material income-producing factor in petitioner's real estate partnerships so as to subject him to the 30-percent limitation of section 1348 [1] and (2) whether guaranteed payments from the partnerships to petitioner are also subject to the 30-percent limitation. *150 The parties have submitted this case with the facts fully stipulated. The parties' stipulation of facts and accompanying joint exhibits are incorporated herein by this reference. Petitioner resided in Hamilton, Ohio, at the time of filing his petition with this Court. [2] For the taxable years 1977 and 1978, petitioner filed individual Federal income tax returns with the Cincinnati Service Center, Covington, Kentucky. On February 19, 1974, petitioner, Alfred A. Moore (Moore) and Walter G. Seinsheimer, Jr. (Seinsheimer), formed a joint venture called Twin Oaks Company to purchase 5.228 acres of land located at Hilton Head Island, South Carolina, and to construct thereon and sell condominium units. Petitioner contributed $70,000 and Seinsheimer and Moore together contributed a matching amount. No additional capital contributions were made to Twin Oaks Company through December 31, 1978. On February 20, 1974, petitioner *151 purchased a 5.228-acre parcel of land from Sea Pines Plantation Company (Sea Pines) for $630,000. Petitioner gave Sea Pines his $480,000 personal note in partial payment for the land. Pursuant to the Twin Oaks Company joint venture agreement, petitioner prior to the purchase had obtained Sea Pines' consent to the assignment of petitioner's rights in the property to Twin Oaks Company. On June 28, 1975, petitioner, Moore and Seinsheimer terminated the joint venture, and petitioner and Seinsheimer formed a limited partnership under the same name as the joint venture (Twin Oaks Company) with petitioner as the only general partner and Seinsheimer as the only limited partner. On July 24, 1975, Moore became a limited partner by acquiring one-half of Seinsheimer's interest. The limited partnership agreement provided that the general partner would receive 50 percent of the profits and losses, and the limited partners the other 50 percent. The agreement further provided that the partnership would pay the general partner a fee of $41,000 for managing the business. Twin Oaks Company subsequently borrowed a total of $3,275,000 from Mellon National Mortgage Company of Ohio (Mellon) for acquisition *152 of an additional 3.3 acres of land on Hilton Head Island and for construction of the Twin Oaks Villas condominium complex. Petitioner, Seinsheimer and Seinsheimer's wife, Dixie Lee Seinsheimer, unconditionally and personally guaranteed repayment of this amount. Twin Oaks Company was general contractor for construction of Twin Oaks Villas and used numerous subcontractors for the project, who were paid with loan proceeds. Twin Oaks Villas ultimately included 41 condominium units, which were constructed between 1975 and 1978. Twin Oaks Company provided a swimming pool and deck, a shed, fencing and landscaping as part of Twin Oaks Villas. Financing for condominium purchasers was arranged through South Carolina Federal Savings and Loan Association (South Carolina Federal). During 1977, Twin Oaks Company sold 14 condominiums at a total sales price of $1,489,375. The cost of the condominiums plus the portion of the cost of the pool and other common amenities allocable to these units was $1,176,512. During 1978, Twin Oaks Company sold 14 condominiums at a total sales price of $1,503,020. The cost of the condominiums plus the portion of the cost of the amenities allocable to the *153 units was $1,230,410. During the taxable years 1977 and 1978, petitioner was general partner and Seinsheimer and Moore were limited partners in a second limited partnership called Twin Oaks II. This limited partnership was formed March 14, 1977, for the purpose of developing additional residential units on Hilton Head Island. The Twin Oaks II limited partnership agreement provided that petitioner would receive 50 percent of the net profits and losses and Seinsheimer and Moore 25 percent each. The agreement further provided for payment of a management fee to petitioner, in an amount to be agreed upon by the partners, for his services in connection with the management of the partnership's affairs. In 1977, petitioner contributed $50,000 in cash to Twin Oaks II while Seinsheimer and Moore each contributed $25,000. No additional cash contributions were made to Twin Oaks II through December 31, 1978. On September 12, 1977, Twin Oaks II pruchased 8.710 acres of land located at Hilton Head Island from Sea Pines for $700,100. Twin Oaks Company and Twin Oaks II borrowed $600,000 of the purchase price from Allomon Corporation. Petitioner, Seinsheimer and Dixie Lee Seinsheimer unconditionally *154 and personally guaranteed repayment of the loan. Twin Oaks Company and Twin Oaks II subsequently borrowed a total of $3,600,000 from Mellon for construction of the Racquet Club Villas condominium complex and for payment of the unpaid principal balance of indebtedness of Twin Oaks II to Allomon Corporation. Petitioner, Seinsheimer and Dixie Lee Seinsheimer unconditionally and personally guaranteed repayment of this amount. Twin Oaks II was general contractor for construction of Racquet Club Villas and used numerous subcontractors for the project. Racquet Club Villas ultimately included 63 condominiums, which were constructed between 1977 and 1978. Twin Oaks II provided a swimming pool, concrete and wood decks, fencing, a pool house, tennis courts, a shed, and landscaping as part of Racquet Club Villas. Financing for condominium purchasers was arranged through South Carolina Federal. During 1978, Twin Oaks II sold 62 of the condominiums and certain property on Magnolia Lane at a total sales price of $4,657,382.40. The cost of the condominiums and the Magnolia Lane property, plus the portion of the cost of the common amenities allocable to the condominiums was $3,455,650. *155 On his individual income tax return for 1977, petitioner reported $185,393 in personal service income from partnerships on a Form 4726 (Maximum Tax on Personal Service Income). For 1977, Twin Oaks Company reported on petitioner's Schedule K-1 (Form 1065, Partner's Share of Income, Credits, Deductions, etc. - 1977) as distributive share items $41,544 in guaranteed payments and $162,608 in ordinary income to petitioner, and Twin Oaks II reported on petitioner's Schedule K-1 (Form 1065) as distributive share items $2,541 in guaranteed payments and $21,300 in ordinary loss. On his individual income tax return for 1978, petitioner reported $612,955 in personal service income from partnerships on a Form 4726. For 1978, Twin Oaks Company reported on petitioner's Schedule K-1 (Form 1065) as distributive share items $15,300 in guaranteed payments and $137,454 in ordinary income to petitioner, and Twin Oaks II reported on petitioner's Schedule K-1 (Form 1065) as distributive share items $23,400 in guaranteed payments and $436,801 in ordinary income. In the statutory notice of deficiency, respondent determined petitioner's personal service net income from Twin Oaks Company and Twin Oaks *156 II to be $55,618 for 1977 and $183,886 for 1978. These amounts represent 30 percent of the total personal service net income from the partnerships claimed by petitioner on his individual income tax returns for those years. Law
At a time when the marginal tax rates exceeded 50 percent, Congress enacted section 1348 to place a 50-percent ceiling on personal service income. Because the maximum marginal income tax rate was reduced to 50 percent or less for taxable years beginning after December 31, 1981, Congress repealed section 1348 as of January 1, 1982. For its effective years, section 1348 [3] applied to personal service income, which for purposes of this case means earned income. Earned income, as defined by section 911(b), includes: wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered * * *. In the case of a taxpayer engaged in a trade or business in which both personal services and capital are material income-producing factors, under regulations prescribed by the Secretary, a reasonable allowance as compensation for the personal services rendered by the taxpayer, not in excess of 30 percent of his *157 share of the net profits of such trade or business, shall be considered as earned income. *158 Respondent determined that both personal services and capital were material income-producing factors with respect to petitioner's income from Twin Oaks Company and Twin Oaks II and, in accord with section 911(b) as applied to section 1348, proposed to limit petitioner's earned income from these activities to 30 percent of his share of the net profits. Petitioner contends that capital was not a material income-producing factor for the partnerships, and that all amounts he received are earned income. [4] We agree with respondent. The Role of Capital in Producing Petitioner's Income
Section 1.1348-3(a)(3)(ii), Income Tax Regs., provides the standards promulgated for determining whether capital is a material income-producing factor in a business: Whether capital is a material income-producing factor must be determined by reference to all the facts of each case. Capital is a material income-producing factor if a substantial portion of the gross income of *159 the business is attributable to the employment of capital in the business, as reflected, for example, by a substantial investment in inventories, plant, machinery, or other equipment. In general, capital is not a material income-producing factor where gross income of the business consists principally of fees, commissions, or other compensation for personal services performed by an individual. Thus, the practice of his profession by a doctor, dentist, lawyer, architect, or accountant will not, as such, be treated as a trade or business in which capital is a material income-producing factor even though the practitioner may have a substantial capital investment in professional equipment or in the physical plant constituting the office from which he conducts his practice since his capital investment is regarded as only incidental to his professional practice. This Court and others have adopted and regularly employed these criteria. See, e.g., Moore v. Commissioner,71 T.C. 533 (1979); Bruno v. Commissioner,71 T.C. 191 (1978); Hardy v. United States,589 F. Supp. 330 (E.D. Wis. 1984). Both capital and personal services are often *160 combined in a business to produce income. In such instances the 30 percent limitation still applies if capital is found to be a material income-producing factor. Gaudern v. Commissioner,77 T.C. 1305, 1310 (1981). In determining whether there is a material use of capital in the production of income, both the form of the income and the nature of the business must be considered. Bruno v. Commissioner,supra at 198. Comparison of the amount of capital to the amount of personal services used in the business is one factor to be considered. Where capital is not income-producing in its own right and customers pay for the services of a professional using the capital, capital is not a material income-producing factor. Bruno v. Commissioner,supra at 200-201. Petitioner asserts that income he received from the partnerships was for services he provided to condominium purchasers. Petitioner describes his services as selecting the sites for the projects and negotiating their acquisition, negotiating financing, aiding in design of the projects, hiring and supervising subcontractors, obtaining zoning, construction permits and utilities, *161 and selling the condominium units. Any use of capital, petitioner suggests, was merely incidental to providing these services. We believe that petitioner overemphasizes the significance of personal services in producing the partnerships' income. Other than petitioner's compensation from the partnerships for management services (which is discussed later herein), neither petitioner nor the partnerships were specifically paid for services rendered. In contrast, the following cases cited by petitioner concern taxpayers who were specifically paid for their services: Zahler v. Commissioner,684 F.2d 356 (6th Cir. 1982), revg. and remanding a Memorandum Opinion of this Court (taxpayer received commissions from a brokerage firm for stock sales); Bruno v. Commissioner,supra (taxpayer received fees from clients for whom she wrote bail bonds); Roselle v. Commissioner,T.C. Memo. 1981-394 (taxpayers paid by refuse collection businesses to supervise their day-to-day operations). Petitioner's distributive share of partnership income, like the percentage shares of the limited partners, came from condominium sales. Sales of condominiums *162 during 1977 totaled $1,489,375, compared to a $1,176,512 cost for such units (including amenities allocable to the sold units). Sales of the Magnolia Lane property and condominiums during 1978 totaled $6,122,294.40, compared to a $4,686,060 cost for sich units (including allocable amenities). The land costs for the condominium complexes were well over a million dollars. The partnerships did not transform relatively low cost raw materials into a valuable finished product with a specialized use. Accordingly, Van Kalker v. Commissioner,     F.2d     (7th Cir. 1984, 54 AFTR2d 5671, 84-2 USTC par. 9727), revg. 81 T.C. 91 (1983), and United States v. Van Dyke,696 F.2d 957 (Fed. Cir. 1982), which petitioner cites, are distinguishable. (In Van Kalker v. Commissioner,supra, the taxpayer designed, fabricated and installed custom railings made from raw iron, and in United States v. Van Dyke,supra, the taxpayer designed and produced taxidermy supplies, such as glass eyes and adhesives, from a variety of raw materials.) In addition, petitioner argues that the partnerships had minimal capital investments. *163 He asserts that the partnerships had no inventory and relatively small amounts of office furniture and other equipment. Petitioner cites Rousku v. Commissioner,56 T.C. 548, 551 (1971), which states that "[i]f capital is 'utilized merely to pay the cost of salaries, wages, office space, and general business expenses, it is not a material income-producing factor but is only incidental to the production of the income.'" [Citations omitted.] Incidental business expenses were not the partnerships' only use of capital, however, and cannot be considered separate from other uses. Large amounts of capital, mostly borrowed, were invested to purchase land and develop Twin Oaks Villas and Racquet Club Villas. Such expenditures are not within the incidental expenses listed in Rousku v. Commissioner,supra.
Petitioner further argues that borrowed capital used to purchase the land and to develop the condominium complexes should not be considered in deciding whether capital was material in producing his income. In Gaudern v. Commissioner,supra at 1312, we stated that the source of capital used in a business is not relevant for *164 purposes of section 1348. "The purpose of the test under section 1348 is to determine whether the income is attributable to the personal services of the taxpayer or whether such income was earned by capital, and in the light of that objective, the source of the capital has no significance." Petitioner acknowledges this aspect of Gaudern v. Commissioner,supra, but argues that this case is distinguishable because of the financing arranged for the condominium purchasers (whom petitioner terms the "ultimate borrowers") and because of the use made of the borrowed funds (which, according to petitioner, the partnerships used to "[arrange] * * * the credit necessary to complete each unit"). Petitioner thus suggests that the source of capital is relevant under section 1348 where certain types of financial arrangements or dispositions of funds are made. Neither Gaudern v. Commissioner,supra, nor any other case petitioner cites supports this position. The partnerships executed loan agreements for millions of dollars. As general partner and guarantor, petitioner was personally responsible for repaying the borrowed funds used in the real estate *165 businesses. The use made of borrowed capital does not negate the need for or import of it in this particular business situation. Although financing was obtained for condominium purchasers and other borrowed capital may have been used for certain items and not others, that does not reduce the quantitative aspect of operating capital employed in Twin Oaks Company and Twin Oaks II. We conclude that there is no basis for distinguishing between borrowed amounts and other sums invested in Twin Oaks Villas and Racquet Club Villas. This case bears similarity to three other cases involving earned income from real estate development, Hardy v. United States,supra,Black v. Commissioner,T.C. Memo 1983-245, and Boshwit Brothers, Inc. v. Commissioner,T.C. Memo 1982-156. In each case the developer's earned income was held to be 30 percent or less of his share of net profits. In Hardy v. United States,supra, the taxpayer provided real estate development services to a subsidiary of a savings and loan association, with which he split the profits from the sale of lots. Although the taxpayer did not purchase the land *166 that was sold or contribute any capital to the venture with the subsidiary, the District Court held that capital was a material income-producing factor in the business and limited the taxpayer's earned income to 30 percent of his net profits. In Black v. Commissioner,supra, the taxpayer was a general partner in a limited partnership that purchased and developed real estate for sale to individual buyers. In order to finance the development, the taxpayer negotiated a loan, on which he was personally liable. Pursuant to the terms of the loan, the bank received 70 percent of the purchase price of each sale. Financing was arranged for individual buyers.[5] While acknowledging the importance of the taxpayer's services to the development, we concluded that the purchasers of lots did not pay the partnership fees for the taxpayer's services, and held capital material to the production of his income. We limited the taxpayer's earned income to 30 percent of his net profits. *167 In Boshwit Brothers, Inc. v. Commissioner,supra, the taxpayer developed a housing subdivision. He bought raw land, planned and helped build the subdivision, negotiated loans, sold lots, and drafted sales contracts. The Commissioner determined that none of the taxpayer's income from the development was earned income. The taxpayer disagreed and maintained that 30 percent of his income from the business was earned income. In a footnote to the opinion, we noted that the taxpayer had apparently conceded that capital was a material income-producing factor with respect to the subdivision. [6] We found the personal services rendered by the taxpayer to be extensive, but because of the taxpayer's failure to offer proof as to the value of those services, we limited his income from personal services to 20 percent of his income from the subdivision.
*168 In his opening brief, petitioner states that real estate developers can have earned income as a result of the personal services they provide. We agree. Hardy v. United States,supra,Black v. Commissioner,supra, and Boshwit Brothers, Inc. v. Commissioner,supra, support petitioner's statement. This record, however, does not support petitioner's position that all of the income from his real estate development businesses was earned income. Petitioner's businesses utilized substantial amounts of capital to purchase and develop land. A substantial portion of the gross income of the businesses, which came from condominium sales, is attributable to this use of capital. We accordingly hold that capital was a material factor in producing the income of petitioner's businesses and that, as proposed by respondent, 30 percent of petitioner's share of the net profits from the partnerships is earned income. Tax Treatment of Guaranteed Payments
In limiting petitioner's earned income for 1977 and 1978 from Twin Oaks Company and Twin Oaks II to 30 percent of petitioner's share of the net profits of the partnerships, *169 respondent included in petitioner's share all amounts received from the partnerships. Petitioner contends that that in so doing respondent erred because petitioner is entitled to exclude guaranteed payments for management services from the 30-percent limitation. Guaranteed payments are determined without regard to the income of a partnership. Sec. 707(c). Since petitioner's $41,000 management fee from Twin Oaks Company was not dependent on the income of the partnership, it represents a guaranteed payment. [7]
Section 1.1348-3(a)(3)(i), Income Tax Regs., applies the 30-percent limitation on earned income to guaranteed payments by including guaranteed payments to a partner in *170 the partner's share of net profits: (3) Earned income from business in which capital is material. (i) If an individual is engaged in a trade or business (other than in corporate form) in which both personal services and capital are material income-producing factors, a reasonable allowance as compensation for the personal services actually rendered by the individual shall be considered earned income, but the total amount which shall be treated as the earned income of the individual from such a trade or business shall in no case exceed to percent of his share of the net profits of such trade or business (which share shall include any guaranteed payment (as defined by § 1.707-1(c)) received from a partnership). For purposes of the preceding sentence, the term "net profits of the trade or business" means the excess of gross income from such trade or business (including income from all sources, whether or not subject to Federal income tax, and without taking into account any deductions which may be allowable under section 1202) over the deductions attributable to such trade or business. The Tax Court and the Second Circuit have upheld the validity of this regulation. Kampel v. Commissioner,72 T.C. 827 (1979), *171 affd. 634 F.2d 708 (2d Cir. 1980). Petitioner, however, argues that the regulation is invalid, and urges us to reexamine our holding in Kampel v. Commissioner,supra.
Petitioner maintains that Congress intended that individuals doing business in corporate form and individuals conducting business in partnership form be similarly treated, and that the regulation, which is inapplicable to individuals doing business in corporate form, thereby conflicts with Congress' intent. Petitioner supports his argument by reference to S. Rept. 95-1263, 1978-3 C.B. (Vol. 1) 315, 506, and H. Rept. 95-1800, 1978-3 C.B. (Vol. 1) 521, 603, which discuss changes in section 1348 made by the Revenue Act of 1978. Section 442(a), Revenue Act of 1978, Pub. L. 95-600, 92 Stat. 2763, 2878, removed the 30-percent limitation on the amount of income that can be treated as personal services income where capital is an income-producing factor, effective for taxable years beginning after December 31, 1978. The legislative materials cited by petitioner express no intent on the part of Congress to clarify or retroactively change the tax treatment of guaranteed payments *172 in prior taxable years. In fact, no specific mention of guaranteed payments is made. [8] We accordingly cannot conclude from the legislative history of section 1348 that section 1.1348-3(a)(3)(i), Income Tax Regs., became invalid for the taxable years at issue. Petitioner further argues that the regulation's 30-percent limitation on earned income from guaranteed payments is contrary to the holding of the Sixth Circuit in Zahler v. Commissioner,684 F.2d 356 (6th Cir. 1982), revg. and remanding a Memorandum Opinion of this Court. The taxpayer in Zahler, a partner in a brokerage firm, received sales commissions from the partnership.There the Sixth Circuit stated that income received by an individual from a trade or business utilizing *173 capital as a material income-producing factor is subject to the 30-percent limitation "if and only if such income represents 'net profits' of the trade or business." Zahler v. Commissioner,supra at 358. The Court concluded that the sales commissions, which were deducted by the partnership from its gross income, did not represent net profits of the partnership, and accordingly held the 30-percent limitation inapplicable to the taxpayer's commission income. Petitioner suggests that his guaranteed payments are deductible from and therefore not attributable to the net profits of the partnerships and, under Zahler v. Commissioner,supra, not subject to the 30-percent limitation. Zahler v. Commissioner,supra, however, did not address the tax treatment of guaranteed payments, and is therefore distinquishable. Unlike income from commissions, guaranteed payments are expressly included in a partner's share of the net profits of a partnership by section 1.1348-3(a)(3)(i), Income Tax Regs.Zahler v. Commissioner,supra, does not suggest that such inclusion is improper. Petitioner additionally cites the *174 following cases to argue that the regulation is invalid: Walt Disney Productions v. United States,327 F. Supp. 189 (C.D. Cal. 1971), affd. 480 F.2d 66 (9th Cir. 1973), cert. denied 415 U.S. 934, (1974); Miller v. Commissioner,52 T.C. 752 (1969); and Carey v. United States,427 F.2d 763, 192 Ct.Cl. 536 (1970). None of these cases merits extended consideration. The 30-percent limitation on earned income was not at issue in Walt Disney Productions v. United States,supra.Miller v. Commissioner,supra, and Carey v. United States,supra, were considered at length in both Kampel opinions and we have nothing to add to those discussions. In conclusion, petitioner's arguments do not persuade us that Kampel v. Commissioner,supra, was wrongly decided and that the regulation is invalid. We accordingly hold that guaranteed payments received by petitioner are includable in his share of the net profits of the partnership, and that petitioner's earned income is 30 percent of this share. To reflect the foregoing, Decision will be entered *175 for the respondent.
Footnotes
*. By order of the Chief Judge, this case was reassigned from Judge Herbert L. Chabot to Judge Joel Gerber↩ for disposition. 1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years at issue. Sec. 1348 was repealed by the Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 172, effective for taxable years beginning after Dec. 31, 1981.↩
2. The stipulation of facts lists Hilton Head Isle, S.C., as petitioner's legal residence. On brief, however, the parties each requested that we find Hamilton, Ohio, the address listed on petitioner's tax returns for 1977 and 1978, as petitioner's legal residence.↩
3. Sec. 1348 provided in pertinent part: (a) General Rule.--If for any taxable year an individual has personal service taxable income which exceeds the amount of taxable income specified in paragraph (1), the tax imposed by section 1 for such year shall * * * be the sum of-- (1) the tax imposed by section 1 on the highest amount of taxable income on which the rate of tax does not exceed 50 percent, (2) 50 percent of the amount by which his personal service taxable income exceeds the amount of taxable income specified in paragraph (1) of this subsection, and (3) the excess of the tax computed under section 1 without regard to this section over the tax so computed with reference solely to his personal service taxable income. (b) Definitions.--For purposes of this section-- (1) Personal service income.-- (A) In beneral.--The term "personal service income" means any income which is earned income within the meaning of section 401(c)(2)(C) or section 911(b) * * *. * * * (2) Personal service taxable income.--The personal service taxable income of an individual is the excess of-- (A) the amount which bears the same ratio (but not in excess of 100 percent) to his taxable income as his personal service net income bears to his adjusted gross income, over (B) the sum of the items of tax preference (as defined in section 57) for the taxable year. For purposes of subparagraph (A), the term "personal service net income" means personal service income reduced by any deductions allowable under section 62 which are properly allocable to or chargeable against such earned income. * * *↩
4. Petitioner contended in his petition that respondent erred by maintaining that petitioner's claimed personal service income is not earned income under sec. 401(c)(2)(C). Petitioner abandoned this argument on brief.↩
5. Petitioner attempts to distinguish Black v. Commissioner,T.C. Memo. 1983-245, on the basis that the taxpayer in Black "did not secure purchaser financing prior to the construction of the projects as the Petitioner did and the initial bank financing was not fully satisfied (i.e., 30 percent remained outstanding to the banks) by the purchaser financing at the time the lots were sold to the purchasers." He concludes that borrowed capital was material in Black but not in this case. As we discuss in the body of this opinion, the financing arrangements a business makes for customers do not change the importance of capital in producing income. Gaudern v. Commissioner,77 T.C. 1305, 1312 (1981). Petitioner also maintains that Black↩ is distinguishable because the taxpayer in that case took a more active role in improving the land than petitioner took in constructing condominiums. We find no basis for this assertion. Even if petitioner's assertion were correct, it would be of no relevance to an inquiry which focuses on the role of capital in a business.
6. Petitioner argues that Boshwit Brothers, Inc. v. Commissioner,T.C. Memo. 1982-156, indicates that it is possible Commissioner,T.C. Memo. 1982-156↩, indicates that it is possible for a person to participate in real estate development without having capital as a material income-producing factor. We find no support in the opinion for petitioner's argument, nor for his statement on brief that "the Court specified that without [the taxpayer's] concession capital as a material income producing factor in the real estate development would have been in issue."
7. The parties have not explained by petitioner received a total of $56,844 in amounts reported as guaranteed payments by Twin Oaks Company when its limited partnership agreement set a $41,000 management fee, nor have they explained why petitioner received a total of $25,941 in amounts reported by Twin Oaks II as guaranteed payments when its limited partnership agreement did not specify an amount for petitioner's management fee. Our holding in this case renders this quantitative factual question moot.↩
8. We note that the congressional reports cited by petitioner were issued prior to our decision in Kampel v. Commissioner,72 T.C. 827 (1979), and that the Second Circuit discussed the Senate report in its opinion, Kampel v. Commissioner,634 F.2d 708, 715-716 (2d Cir. 1980), affg. 72 T.C. 827↩ (1979). We are not able to afford this legislative history any more importance at this time.